1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                                * * *
6    EBERTO BAUTISTA-EREDEA,                Case No. 3:20-cv-00403-MMD-CLB
7                           Petitioner,                ORDER
8         v.
     NETHANJAH BREITENBACH,[1] *et al.*,
9
                            Respondents.
10

11   **I.      SUMMARY**

12          This matter is before this Court for disposition of the merits of a counseled Third

13   Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 ("Petition" (ECF

14   No. 34)) brought on behalf of Eberto Bautista-Eredea. In 2009, a Nevada jury found

15   Bautista guilty of sexual assault and first-degree kidnapping but acquitted him of an

16   additional charge for sexual assault, and he was sentenced to 10 years to life in prison.

17   (ECF Nos. 14-3; 14-9.) The Nevada Supreme Court ("NSC") reversed his conviction for

18   first-degree kidnapping and the State declined to retry him for that offense. (ECF Nos. 9-

19   1 at 34; 15-5 at 2.) The Petition challenges the remaining conviction for sexual assault.

20   (ECF No. 34.) Bautista raises four grounds, alleging a freestanding claim of actual

21   innocence, trial error, ineffective assistance of trial counsel, and a violation of *Brady v.*

22   *Maryland*, 373 U.S. 83 (1963). For the reasons discussed below, the Court grants a

23   conditional writ of habeas corpus for Ground 2(A), denies the remaining grounds of the

24   Petition, grants a Certificate of Appealability for Grounds 1, 2(B), 2(E), 3(C), and 4, as set

25   forth in the discussion of those claims, vacates the judgment, and reverses and remands

26   for a new trial.

27          [1]Bautista-Eredea is incarcerated at Lovelock Correctional Center where Nethanjah
28   Breitenbach is the current warden. The Court directs the clerk of the court to substitute
     Nathanjah Breitenbach for respondent Warden Garrett under FED. R. CIV. P. 25(d).

1
2

## II.    BACKGROUND[2]

### A.    The Prosecution's Case

3    M.C. testified she is a 35-year-old handicapped woman who cannot read or write

4    (ECF No. 12-1 at 11-14.) On October 8, 2008, at around 7:30 p.m., her scooter battery

5    died while on her way home from work. (*Id.* at 14-16, 47-48.) She could not reach anyone

6    on her cellphone. (*Id.*) Bautista, whom she did not know, was driving by and stopped and

7    offered to take her and her scooter to her home in his vehicle, but she refused his offer.

8    (*Id.* at 16-19, 54.) She said Bautista kept insisting and that she told him she did not want

9    to get inside his car. (*Id.*) She wore shorts and a tank top without a bra or underwear, and

10    he kept touching her even though she told him to stop and leave her alone. (*Id.* at 52, 56-

11    57.) He placed her scooter inside his vehicle, took her by her deformed right arm, and

12    told her to "get in" his vehicle and he would take her home. (*Id.* at 18, 51-52.)

13    M.C. said Bautista touched her genitals while he drove to an abandoned

14    restaurant. (*Id.* at 20-22.) She told him she did not want him to touch her and to take her

15    home. (*Id.*) When they arrived at the restaurant, he grabbed her right arm and removed

16    her from the vehicle. (*Id.*) He then pulled down her shorts and sodomized her. (*Id.* at 21-

17    24.) She said she was crying and bleeding and asked him to stop. (*Id.*)

18    M.C. said Bautista returned her to his vehicle and told her he would take her home,

19    but he instead took her to a dead-end street where a path to an old vehicle was located.

20    (*Id.* at. 24-28.) She told him to stop kissing her and she wanted to go home, but he did

21    not stop. (*Id.* at. 61, 66.) She refused to perform oral sex on him. (*Id.*) He again grabbed

22    her right arm, removed her from his vehicle, and took her down the path to the old vehicle.

23    (*Id.* at 61-62.) Before he did anything else to her, Bautista made a telephone call in

24    Spanish that lasted 15 to 20 minutes. (*Id.* at 78-79.) M.C. tried to leave, but Bautista hung

25

26    ²The Court summarizes the relevant state-court record solely as background for
27    consideration of the issues in this case. The Court makes no credibility or factual findings
regarding the truth or falsity of evidence or statements of fact in the state court. No
assertion of fact made in describing statements, testimony, or other evidence in the state
28    court constitutes a finding by the Court. Failure to mention a specific piece of evidence or
category of evidence does not signify the Court overlooked it in considering the issues.

up the telephone, chased her down, grabbed her, and took her back down the path where he again sodomized her. (*Id*. at 79-80.) She told him to "please stop, you're hurting me," but he only stopped because his phone rang. (*Id*. at. 27-28, 55-56, 79.) She wanted to scream for help but was scared for her life and he told her to keep quiet. (*Id*. at 63.)

M.C. said Bautista took the short call, they returned to his car, and she directed him to her house. (*Id*. at 27-28, 67-68.) He told her he would see her next time and she replied, "don't bother." (*Id*. at 68-69.) After he left, she washed her clothes as there was blood on her shorts and took a bath because she was bleeding. (*Id*. at 29-30.) She spoke with her mother and a friend that night but told neither about the incident. (*Id.*) The next day, M.C. told her employer about the incident and the Mesquite Police Department ("MPD") was called to investigate that day. (*Id*. at 29, 31-34.)

MPD Detective Hoggard transported M.C. to Mesa View Hospital for a sexual assault examination. (*Id*. at 93-97.) M.C. directed Hoggard to the two locations of the alleged rapes. (*Id*. at 95-96.) Contrary to M.C.'s testimony, M.C. told Hoggard that Bautista tried to suck her nipples and did not tell Hoggard that Bautista requested oral sex or that she tried to run away when she was at the old vehicle and that he chased her down. (*Id*. at 124-27.) Hoggard found nothing of evidentiary value at the restaurant but photographed tire tracks (that did not match any relevant vehicle) and shoe prints (that resembled those belonging to Bautista) at the scene of the old vehicle. (*Id*. at 97-99, 104, 110-111, 130.) Hoggard found no witnesses and no evidence of a struggle at either scene. (*Id*. at 127, 130-31.) M.C.'s telephone showed she made calls at 6:30, 6:45, and 8:10 p.m. on October 8, 2008. (*Id*. at 129-30, 137-38.)

Sexual assault nurse Deborah Young examined M.C. at 1:30 p.m. the day after the incident. (*Id.* at 153.) M.C. told Young she was raped the previous night between 7:30 and 8:30 p.m., and that she bathed and defecated after the incident. (*Id*. at 153, 156.) M.C. told Young that Bautista kissed her and digitally penetrated her vagina, but she refused him oral sex. (*Id*. at 154, 156.) Young found no scratches or bruises to M.C.'s vagina, head, trunk, arms, or legs. (*Id*. at 143-44, 153-54.) M.C. reported Bautista's penis

penetrated her anus without using lubricant or a condom. (*Id.* at 157.) Young found "a tear" or "laceration" in the "11, 12 o'clock" area and an "abrasion" "about six o'clock," on M.C.'s anus, but no active bleeding. (*Id.* at 144.)

On February 13, 2009, M.C. encountered Bautista at the Maverik gas station and convenience store in Mesquite. (*Id.* at 36.) Bautista rubbed the back of M.C.'s neck and asked if she remembered him, but she told him "no," however, after he kissed her, she said, "now I remember who you are. You are the one that they are looking for." (*Id.* at 38, 71.) Maverik employee Sally Morris Lantow testified she knew M.C., saw a man rub M.C.'s neck "like he knew her," heard the man say, "do you remember" or "you remember," and heard them talking to each other, but did not see M.C. touch or turn toward the man. (ECF No. 13-1 at 17-19, 21-23.) Based on the way the man touched M.C., but not anything M.C. did, Lantow thought M.C. "found a boyfriend." (*Id.*)

According to MPD Detective Ron Richmond, surveillance video from Maverick depicted M.C. and Bautista entering Maverik separately, and Bautista exiting the store with her exiting a few feet behind him. (*Id.* at 184, 191-93, 200.) M.C. testified she refused to go with Bautista to a casino as she knew he wanted "the same thing." (*Id.* at 72.) M.C. said Bautista followed her home but left after she told him to "go away" and leave her alone. (*Id.* at 39.) M.C. called MPD, and Detective Richmond located Bautista at Virgin River Casino. (*Id.* at 40-41, 180-82, 184-87.)

**B.    The Defense's Case**

Bautista testified that he dropped his girlfriend, Heidi Martinez, at her place of employment around 7:30 p.m. on the night he met M.C. (ECF No. 13-1 at 60-61.) Martinez testified Bautista is her boyfriend and lives with her in Mesquite. (*Id.* at 35.) Martinez said that, on the night of October 8, 2008, Bautista was with her at home until he took her to her place of employment at "7:30ish." (*Id.* at 38, 46.) Bautista said that, after he dropped off Heidi, he saw M.C. pushing her cart and he stopped and asked if she needed a lift and told her he could take the scooter with them if it fit inside his vehicle, which it did. (*Id.* at 60-63.) He said he opened the vehicle door for M.C., and she entered the vehicle "by

herself." (*Id.* at 65.) He said they talked and flirted while he drove. (*Id.* at 67-68.) He denied driving to the restaurant but admitted he parked by the path that led to the old car where, other than kissing, he did not touch her in the vehicle. (*Id.* at 68-71.) He said he assisted her in exiting the vehicle, and she consented to walking with him down a path to an old vehicle. (*Id.*)

Bautista said they started kissing and touching each other, he lowered her shorts, and after they took off each other's pants, M.C. turned around with her back toward him, and they started having sex "for a minute" but did not finish because he answered a telephone call from Martinez. (*Id.* at 70-72.) Martinez testified that, according to her telephone record, which was admitted into evidence at trial, her children telephoned her at 7:37 p.m. to inform her they needed a ride home. (*Id.* at 38-40.) Her telephone record shows she called Bautista at 7:38 p.m., and she said she told him the children needed a ride. (*Id.* at 40-41.) Bautista said M.C. thereafter directed him to her house, he unloaded her cart, they parted with a hug and a kiss, and he picked up the children. (*Id.* at 75-76.) Bautista denied M.C. told him to stop touching her or that it hurt her. (*Id.* at 89.) He denied grabbing her hand or wrist, restraining her, that she struggled against him, and that she ran away from him. (*Id.* at 74-75.) He denied asking her to perform oral sex. (*Id.* at 71.) Bautista claimed it was not until trial that he realized he had penetrated M.C.'s anus, as there was no indication of complaint (such as moaning) at the time of the incident, which lasted not even a minute before Martinez's call. (*Id.* at 72, 100-01, 103-04.) He agreed that he penetrated M.C., but he could not say whether he caused her injury. (*Id.*)

Bautista testified that when he saw M.C. at Maverik, he touched her on the shoulder, they kissed each other on the cheek, and she agreed to go with him to the casino. (*Id.* at 78-82.) He said they agreed she would drop the scooter at her house, and he would wait for her there. (*Id.*) He waited for 10 minutes and left for the casino because she didn't come out. (*Id.* at 82-83.)

## III.    GOVERNING LEGAL STANDARDS

According to the Anti-Terrorism and Effective Death Penalty Act (AEDPA), when a

state court has adjudicated a habeas corpus claim on its merits, a federal court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 409-10, 412) (internal citation omitted). State courts need not be aware of or cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102 (citing *Lockyer*, 538

U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal citations omitted). The petitioner has the burden of proof. *See Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

## IV.    DISCUSSION

### A.    Ground 1: Freestanding Claim of Actual Innocence

Bautista alleges he is innocent and his conviction for sexual assault is invalid under federal constitutional guarantees of due process and equal protection under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 34 at 8.) He alleges information contained in MPD reports made before and after his 2009 trial evince M.C. fabricated her allegations against him because the reports show M.C. has a pattern of making false allegations of sexual assault, and therefore no reasonable jury would find him guilty beyond a reasonable doubt. (*Id.*) Respondents argue a freestanding claim of actual innocence is not cognizable in federal habeas, and the MPD reports show "legal innocence" but not "factual innocence" as they contain only impeachment information. (ECF No. 51 at 11-14.)

#### 1.    Additional Background

##### a.    M.C. Made Reports to MPD Before Bautista's Trial

The incident between M.C. and Bautista occurred on October 8, 2008, and trial occurred during August 31, 2009, through September 3, 2009. (ECF Nos. 11-1; 12-1; 13-1.)

On May 21, 2009, MPD responded to a call from the Virgin River Casino that M.C. reported a Hispanic man stole her wallet and camera. (ECF No. 30-3.) M.C. told security she went into a hotel room with the man where she was forced to take a shower and the man stole her wallet and camera. (*Id.*) When MPD arrived, M.C. initially told them she did not enter the man's hotel room and stood outside the room door while the man reached into her purse and stole her wallet and camera. (*Id.*) She later admitted to MPD that she

in fact entered the hotel room voluntarily to prostitute herself for $20 and was not forced to shower. (*Id.*) Her belongings were found but she did not wish to press charges. (*Id.*)

On June 8, 2009, M.C. reported her wallet missing. (ECF No. 30-1.) She told MPD she was walking home when two men, whom she met earlier, offered her a ride. (*Id.*) She told them no, but they insisted so she got into their truck. (*Id.*) After they dropped her off, she realized her wallet was missing and believed it fell out of her purse inside the truck. (*Id.*) She claimed the wallet contained $1000 in gambling winnings. (*Id.*)

On June 13, 2009, MPD responded to a call that M.C. might be involved "in some illegal activity" inside a truck parked behind a gas station. (ECF No. 30-2.) The Call Detail states "thought officer should check on [M.C.] know[n] to have history of prostitution in the city. [S]ubject was walking toward I-15 in some very suggested [sic] clothing and complainant thought she should be checked." (*Id.*)

### b.    M.C. Made False Rape Allegations After Bautista's Trial

On December 23, 2009, M.C. told her boyfriend and casino security at Virgin River Casino that she was raped. (ECF No. 30-4.) M.C. initially told MPD she was raped by an unknown Hispanic male who approached her in the casino, and whom she followed outside. (*Id.*) M.C. later admitted to MPD that she agreed to have sex with the man for $40. (*Id.*) M.C. was arrested because MPD previously warned her about prostitution. (*Id.*)

On April 6, 2013, M.C. reported a man named Ron knocked on her house window, she let him inside her home, and he forced himself on her, but she did not wish to press charges. (ECF No. 30-5.)

On July 13, 2013, M.C. reported that her husband raped her. (ECF No. 30-6.) She did not want MPD to arrest him, she wanted MPD to tell him to listen to her when she asks him to stop during sex. (*Id.*) Her husband told MPD he did not force her to have sex, rather, M.C. knew he was incarcerated for a sex crime and threatened to call MPD if he refused her money. (*Id.*) MPD concluded that "[t]he complainant has a mental disorder and an assault never occurred," and it was a "False Report." (*Id.*)

///

On July 16, 2013, M.C. reported she was walking home when a man offered her a ride, she refused, and he exited his vehicle and tried to touch her breasts. (ECF No. 30-7.) She reportedly kicked the man and he left, however, she also identified a baseball cap lying in her yard as belonging to the same man. (*Id.*) MPD located the man, who identified his cap, and stated M.C. accepted a ride from him and invited him inside her home to have sex. (*Id.*) M.C. admitted she falsely accused the man to "make things better with her husband." (*Id.*) M.C. was charged with, *inter alia*, making a false report. (*Id.*)

In a letter from December 14, 2015, a county public defender for another defendant learned about M.C.'s false reports of sexual assault and informed Bautista that she spoke with MPD officers who indicated that M.C. "may have tried to file more false reports, but they stopped taking reports from her after a time," and four named officers said they did not believe M.C. to be a truthful person. (ECF No. 15-21 at 28.)

### 2. Standard for a Freestanding Actual Innocence Claim

Neither the Supreme Court nor the Ninth Circuit has determined whether a freestanding claim of actual innocence is cognizable on federal habeas review, however, each has assumed, without deciding, such a claim is viable. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("Whether [a federal constitutional right to be released upon proof of actual innocence] exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); *House v. Bell*, 547 U.S. 518, 555 (2006) (declining to resolve whether freestanding-innocence claims are possible and concluding that while the petitioner cast sufficient doubt on his guilt to satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default, he failed to meet "[w]hatever burden a hypothetical freestanding innocence claim would require"); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) ("We have not resolved whether a freestanding actual

1    innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital

2    context, although we have assumed that such a claim is viable.").

3         The Supreme Court stated that "[c]laims of actual innocence based on newly

4    discovered evidence have never been held to state a ground for federal habeas relief

5    absent an independent constitutional violation occurring in the underlying state criminal

6    proceeding." *Herrera v. Collins,* 506 U.S. 390, 400 (1993) (citing *Townsend v. Sain*, 372

7    U.S. 293, 317 (1963)). In *Herrera*, the Court explained that "[t]his rule is grounded in the

8    principle that federal habeas courts sit to ensure that individuals are not imprisoned in

9    violation of the Constitution-not to correct errors of fact." *Id.* (citing *Moore v. Dempsey*,

10   261 U.S. 86, 87-88 (1923) ("[W]hat we have to deal with [on habeas review] is not the

11   petitioners' innocence or guilt but solely the question whether their constitutional rights

12   have been preserved . . . ."). The Court further expounded that "[w]e may assume, for the

13   sake of argument in deciding this case, that in a capital case a truly persuasive

14   demonstration of 'actual innocence' made after trial would render the execution of a

15   defendant unconstitutional and warrant federal habeas relief if there were no state avenue

16   open to process such a claim." *Herrera*, 506 at 417. The Court went on to say that "[t]he

17   threshold showing for such an assumed right would necessarily be extraordinarily high,"

18   and that the showing in that case fell short of any such threshold. *Id.*

19        Notwithstanding the Supreme Court's statements that it has not decided whether

20   a freestanding innocence claim may be raised in a federal habeas corpus proceeding, the

21   Ninth Circuit has concluded that, "the threshold for a freestanding claim of innocence

22   would have to be 'extraordinarily high,'" and that it "contemplates a stronger showing than

23   insufficiency of the evidence to convict" or "doubt about his guilt." *Carriger v. Stewart*, 132

24   F.3d 463, 476 (9th Cir. 1997) (internal citations omitted). The Ninth Circuit has moreover

25   held the required showing would "have to be at least as high as the more demanding

26   standard articulated by Justice Blackmun in his *Herrera* dissent," which stated "that to be

27   entitled to relief, a habeas petitioner asserting a freestanding innocence claim must go

28   beyond demonstrating doubt about his guilt, and must affirmatively prove that he is

probably innocent." *Carriger*, 132 F.3d at 476 (citing *Herrera*, 506 U.S. at 442-44 (Blackmun, J., dissenting)); *accord Jones*, 763 F.3d at 1246. The Ninth Circuit concluded in *Carriger* that, "[i]n light of the presumption of guilt that attaches after a constitutionally valid conviction, 'it is fair to place on [a petitioner asserting a *Herrera* claim] the burden of proving his innocence, not just raising doubt about his guilt.'" *Carriger*, 132 F.3d at 477 (quoting *Herrera*, 506 U.S. at 443 (Blackmun, J., dissenting)).

### 3.    State Court's Determinations

The NSC declined to consider this claim because it is not clear whether a freestanding claim of actual innocence may be raised in a postconviction petition for a writ of habeas corpus, and NRS § 34.900 *et seq.*, provides a mechanism in Nevada to assert a factual-innocence claim based on newly discovered evidence:

> [A]ppellant argues that he is actually innocent of sexual assault because police reports show that following the trial the victim made false allegations of sexual assault. We determine no relief is warranted at this time on a claim of actual innocence. A gateway claim of actual innocence is unavailable in this case because appellant's petition was not procedurally barred. *See Pellegrini v. State,* 117 Nev. 860, 887, 34 P.3d 519, 537 (2001) (describing gateway claim of actual innocence). And we have previously questioned whether a freestanding claim of actual innocence can be raised in a postconviction petition for a writ of habeas corpus, *see Berry v. State,* 131 Nev. 957, 966 n.2, 967 n.3, 363 P.3d 1148, 1154 nn. 2, 3 (2015) (noting that it is not clear whether a free-standing claim of actual innocence may be raised in a postconviction petition for a writ of habeas corpus). The Legislature, however, has recently created a new mechanism for a person who has been convicted to assert his or her factual innocence based on newly discovered evidence. *See* NRS 34.900.990. In light of the new remedy, we decline to consider appellant's freestanding claim of innocence as he may raise this claim in a petition filed pursuant to NRS 34.900.
>
> [FN 11] We express no opinion as to whether appellate can satisfy the requirements of a factual-innocence petition.

(ECF No. 18-7 at 9-10.)

### 4.    Analysis of Ground 1

The NSC reasonably declined to reach the merits of the federal freestanding claim of actual innocence because, as it noted, the Supreme Court has not yet clearly established the existence of a freestanding-actual-innocence claim. Thus, it cannot be said that the state court unreasonably failed to apply clearly established Federal law as

determined by the Supreme Court. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("[I]t cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law'" when no Supreme Court holding addresses the claim).

Bautista claims six justices—Justices O'Connor, Kennedy, and White in their concurring opinions in *Herrera*, and Justices Blackmun, Stevens, and Souter in dissenting opinions—agreed the federal constitution provides a claim for relief to those who can prove they are innocent with newly discovered evidence. (ECF No. 68 at 22.) However, "clearly established Federal law" for purposes of § 2254(d)(1), includes only "the holdings, as opposed to the *dicta*, of [the Supreme Court]'s decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citing *Howes v. Fields*, 565 U.S. 499, 505 (2012) and quoting *Williams*, 529 U.S. at 412 (internal quotation marks omitted)). It is true that, "[w]hen a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . ." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotation marks omitted). However, the majority decision in *Hererra* enjoyed the assent of five Justices, thus, it is not clear that resort to concurring opinions to identify the clearly established law in *Herrera* is warranted.

Assuming *arguendo* that the Supreme Court has clearly established a freestanding-actual-innocence claim,[3] and assuming that the NSC unreasonably failed to adjudicate the merits of the claim, this Court would conclude on *de novo* review that Ground 1 lacks merit because the MPD reports do not contain exonerating evidence. *See e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (stating that "[c]ourts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, *see* § 2254(a).").

---

[3]This Court must follow circuit precedent unless that precedent is "clearly irreconcilable with the reasoning or theory" of a Supreme Court opinion. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).

Bautista maintains the information in the MPD reports makes it probable that M.C. fabricated the accusations against him because the reports show she fabricated similar accusations against more than one similarly situated individual. (ECF No. 68 at 26-27.) Although Bautista has raised doubt about his guilt, he has not met the minimum threshold required by even the Ninth Circuit to demonstrate affirmative proof he is "probably innocent." *See Carriger*, 132 F.3d at 476. The reports for May 21, June 9, and June 13, 2009, do not contain false sexual-abuse allegations. *See supra* at 7-8. They do suggest M.C. changed her stories or lied to authorities, however, M.C. was impeached at trial by her admission that she previously gave false statements to police in connection with her May 2009 report. *See infra*, p.16. The information might result in evidence that further impeaches M.C. but does not exonerate Bautista.

The report in April 2013 does not contain information about a false statement to police. *See supra* at 8. The reports made on December 23, 2009, and July 13 and 16, 2013, indicate M.C. initially made accusations of sexual assault (against men other than Bautista), but later admitted she consented to the sexual encounters. *See supra* at 8-9. This new evidence did not exist at the time of Bautista's trial. Although, the information might now call into question M.C.'s credibility about whether she consented to the sexual encounter with Bautista, it stops short of affirmatively proving M.C. consented to anal sex with Bautista. *See, e.g.*, *Taylor v. Beard*, 811 F.3d 326, 334 (9th Cir. 2016) ("Taylor would not have been able to vacate his felony murder conviction because at best he has established that the jury relied on an incorrect theory, not that he was factually innocent of the crime."); *Jones*, 763 F.3d at 1251 ("[E]vidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence."); *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) (rejecting a freestanding-actual-innocence claim based on recanted allegations of sexual abuse, because, although the new evidence "certainly cast doubt on his conviction" the recantations did not prove the defendant was probably innocent); *Carriger*, 132 F.3d at 477 ("Although the

postconviction evidence [Carriger] presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence.").

Assuming the MPD reports would establish M.C. had a modus operandi of falsely accusing men of sexual abuse, such evidence would fail to show Bautista was probably factually innocent. Rather, it might prove only that there is a reasonable probability the State could not prove its case beyond a reasonable doubt. The Supreme Court and the Ninth Circuit have stated that a freestanding actual innocence claim—assuming one is appropriate in a federal-habeas proceeding—would require more. The Supreme Court and the Ninth Circuit have stated that, even when considering only a *Schlup* gateway claim, "'actual innocence' means factual innocence, not mere legal insufficiency." *See Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir. 2003) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

For the foregoing reasons, Bautista is not entitled to federal habeas relief on Ground 1. The Court will, however, issue a Certificate of Appealability for Ground 1 because reasonable jurists could conclude the Court's assessment of the constitutional claim is debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**B.    Ground 2: Claims Raised on State Direct Appeal**

**1.    2(A): Limitation on Cross-Examination of M.C.**

Bautista alleges that precluding him from cross-examining M.C. about her false accusations to casino security and MPD on May 21, 2009, violated his rights to due process, a fair trial, and to present a defense under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 34 at 21-24.) He alleges it was error to disallow cross-examination exposing M.C.'s "lie to law enforcement regarding her consensual encounter with another Hispanic male while also falsely accusing that person of abduction." (*Id.*) He alleges such evidence would demonstrate she was "not averse to lying or omitting information pertaining to her sexual conduct with the subjects of her false accusation" and "not averse to having sexual intercourse with complete strangers, had no problem

reporting false allegations of rape, and was not traumatized" by her encounter with Bautista. (*Id.*) Respondents argue the NSC reasonably concluded the sexual conduct contained in the May 2009 report was irrelevant to Bautista's defense and was inadmissible. (ECF No. 51 at 17-18.)

### a.    Additional Background

Before trial, the State filed a motion *in limine* to exclude M.C.'s statements that she engaged in prostitution and the circumstances surrounding her May 2009 report to MPD. (ECF No. 10-2 at 5.) Defense counsel conceded evidence of prostitution need not be admitted, but argued the court must admit the evidence of M.C.'s character for truthfulness:

> [I]n this instance, I kind of don't care if the prostitution comes in for the jury here because I understand that's prejudicial, [sic] I more care about the fact . . . here she is telling the exact same sorry [sic] to the police, and she admits that she is lying about it.
>
> I care about her character trait for honestly [sic] and truthfulness is what I do care about, and that's why I'm saying this is very important.
>
> As it talks about prostitution, of course, for rape shield purposes, but I understand—I would be perfectly fine, Your Honor, if you don't want the jury prejudice that we don't go into this factor for 20 bucks.

(ECF No. 11-1 at 13-14.)

The trial court engaged a lengthy discussion and ruled that defense counsel could not mention anything about prostitution or sex, but could ask M.C. whether she filed a report of being a victim of a crime where she lied about the circumstances:

> I'm going to let you . . . ask her on the witness stand if she has filed a report of being a victim of a crime where she . . . lied about the circumstances, and you are going to be able to show her the report that the officer wrote.
>
> We are not going to mention anything about, in fact, the prostitution is going to be redacted.
>
> . . . .
>
> And I will let you use that for the limited purpose of establishing if she admits that she made a police report as a victim of a crime and made false statements to the police in that report, and I will let you go into that—that part of the scenario for purposes, and I think that this then really is giving me heartburn because evidence of the character trait of the victim in a crime, and you are trying to show that she established—or that she has made a false report or made a report that had false information that had to be

1    corrected, I mean, then you can go ahead, and then you can go just trail that
     right off into this scenario:

2           Isn't it also true in this case that you made a report that such and such
     happened, and that's not exactly what happened.

3           And you can do that to that extent, but that's all I am going to allow

4    in, and I am not going to, and I do think that the concept of impeachment by
     extraneous sources of information is prohibited, and I think you are going to
     be limited for impeachment to just what you can get from her on the witness

5    stand, and I will allow you to show her the statements that you are claiming
     where she has admitted to making—even lying in the police report, or lying

6    to the police.

7    . . . .

8           I think it's the fair thing to do on any type of—I think that's the only
     basis upon which you really are going to be able to connect that to this, and

9    make that relevant to this, that she filed a false—that she filed a police report,
     that she made false statements, and then turn it into, and isn't it true in this

10   case, you filed a police report, and you also made falls [sic] statements.

11   (*Id.* at 32-36.)

12          On cross-examination, defense counsel elicited M.C.'s admission she reported

13   an unrelated crime and made statements to the police that she knew were false:

14   Q. Do you recall talking to the police at the Virgin River Casino?

15   A. That's right.

16   Q. On May 21, of '09?

17   A. That's right.

     Q. And you made a claim that you have been the victim of a crime, right?

18   A. That's right.

19   Q. And during that time, you gave some statements to the police that
     were false?

20   A. That's right.

21   Q. You lied to them?

22   A. Yes.

     Q. Is that correct?

23   A. What? Say that again?

24   Q. You gave statements that were false, right?

25   A. I guess.

     Q. And you knew they were false?

26   A. Yes.

27   (ECF No. 12-1 at 74-75, 80.)

28

### b.    Rights to Present a Defense and Cross-Examination

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) (internal and other citations omitted). The right to confront witnesses, includes the right to "conduct reasonable cross-examination." *See Olden v. Kentucky*, 488 U.S. 227, 231 (1988). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). If cross-examination bears on bias, reliability, or credibility, courts may not "speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted [the defendant's] line of reasoning had counsel been permitted to fully present it." *See id*. at 317. It is enough that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defendant] been permitted to pursue his proposed line of cross-examination." *See Olden*, 488 U.S. at 232 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). *See also e.g., Davis*, 415 U.S. at 319 ("Serious damage to the strength of the state's case would have been a real possibility had petitioner been allowed to pursue [the proffered] line of inquiry.").

Where cross-examination might reasonably cause a jury to question a witness's reliability or credibility, trial judges nevertheless "retain wide latitude" insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *See Olden*, 488 U.S. at 232. The Supreme Court stated that a trial court's "restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence" must be "reasonable" and "may not be arbitrary or disproportionate to the purposes [the restrictions] are designed to serve." *Michigan v.*

1    *Lucas*, 500 U.S. 145, 149 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

2    For instance, in Nevada, "[a]lthough relevant, evidence is not admissible if its probative

3    value is substantially outweighed by the danger of unfair prejudice, of confusion of the

4    issues or of misleading the jury" or "by considerations of undue delay, waste of time

5    or needless presentation of cumulative evidence." NRS § 48.035.

6          Thus, the Ninth Circuit applied a "two-part inquiry" to determine whether the

7    exclusion of evidence violated a criminal defendant's Sixth Amendment rights. *See*

8    *Wood v. State of Alaska*, 957 F.2d 1544, 1549-1550 (9th Cir. 1992). First, a court

9    determines "whether the excluded evidence is relevant." *Id.* For instance, a court

10   considers whether the proffered cross-examination sufficiently bore upon the witness's

11   credibility "such that no fairminded jurist could disagree that the cross-examination

12   could have influenced the jury's assessment of [the witness]." *See Ortiz v. Yates*, 704

13   F.3d 1026, 1036 (9th Cir. 2012). Second, if the evidence is relevant, a court considers

14   whether "legitimate interests outweighed [the defendant]'s interest in presenting the

15   evidence." *Wood*, 957 F.2d at 1550.

16                    **c.    State Court's Determinations**

17         On direct appeal, the NSC determined the district court's ruling limiting cross-

18   examination about the details underlying the false statements made to the police in May

19   of 2009 was appropriate insofar as the sexual assault charges, but deprived Bautista the

20   right to present evidence relevant to the kidnapping charge:

21             Roughly four months after Bautista's arrest and eight months after
       the charged assaults and kidnapping, police were again summoned to the
22     Virgin River Casino, this time to process a theft report by M.C. to casino
       security. M.C. complained that her wallet and camera had been stolen.
23     Police first spoke to the security officer, who related that M.C. had been
       seen at the casino bar alone and then left with an unidentified Hispanic
24     male. The security officer also told police that, in reporting the theft, M.C.
       said that the man had forced her into the shower in his hotel room and that,
25     while she was in the shower, the man had stolen her wallet and camera.
       The police then spoke to M.C. directly.
26
               M.C. appeared mentally handicapped and intoxicated, according to
27     the police report. The report stated that M.C. initially told police that she did
       not enter the man's hotel room. Rather, she stated that she had been
28     standing outside a hotel room door when a Hispanic man reached into her
       purse and took her wallet and camera. She explained that she did not

                                          18

scream or call for help because "I was afraid of what he could do to me." After further questioning, M.C. told police that she did go into the hotel room voluntarily, where she had sex with the man in his room for $20. She admitted that the man did not force her into the room or the shower. She stood firm in her theft complaint, stating that when she got out of the shower she found the man gone, along with her wallet and camera.

No arrests or charges came of this episode. The theft allegation was validated several hours later, though, when the police received a call from authorities in a nearby Utah town. The Utah authorities advised that they had arrested two Hispanic men on unrelated local charges and found them in possession of a camera and a wallet containing M.C.'s identification.

. . . .

[B]efore trial, the State filed a motion in limine to exclude evidence concerning M.C.'s theft report, especially that pertaining to her prostitution, as irrelevant, prejudicial, and inadmissible under Nevada's rape shield statute, NRS 50.090.

[FN 2] NRS 50.090 reads:

In any prosecution for sexual assault or statutory sexual seduction or for attempt to commit or conspiracy to commit either crime, the accused may not present evidence of any previous sexual conduct of the victim of the crime to challenge the victim's credibility as a witness unless the prosecutor has presented evidence or the victim has testified concerning such conduct, or the absence of such conduct, in which case the scope of the accused's cross-examination of the victim or rebuttal must be limited to the evidence presented by the prosecutor or victim.

The motion was briefed and argued. During argument, defense counsel stated that "I kind of don't care if the prostitution comes in . . . because I understand that's prejudicial [and a]s it talks about prostitution, of course, for rape shield purposes, . . . I would be perfectly fine, Your Honor, if you don't want the jury prejudiced that we don't go into this factor [of her engaging in sex] for 20 bucks." However, he argued that M.C.'s false reports of coercion by Hispanic male strangers bore on her credibility, bias, and motive to lie, and also rebutted the implication she was a guileless innocent, and thus should be admitted. Thereafter, the court issued a split ruling: Bautista could question M.C. about having made false statements to the police on another occasion but could not get into the underlying factual details. Thus, on cross-examination, M.C. was asked if, and admitted that, some months after her encounters with Bautista, she told the police she had been the victim of another crime; that, in reporting the crime, she "gave some statements to the police that were false;" that she "lied to them;" and that she knew the statements were false. No further details were elicited.

. . . .

Bautista challenges the district court's refusal to allow him to question M.C. about the circumstances giving rise to her theft report as both constitutional and evidentiary error. First, he contends that the district court's ruling deprived him of his due process right to present evidence tending to prove his theory of the case and to confront M.C. fully. *See Vipperman v. State,* 96 Nev. 592, 596, 614 P.2d 532, 534 (1980). Second, he argues that under *Drake v. State,* 108 Nev. 523, 836 P.2d 52 (1992), and *Cox v. State,* 102 Nev. 253, 721 P.2d 358 (1986), this evidence was

admissible despite the rape shield statutes. While we conclude that the rape shield statutes support the district court's split ruling as to the sexual assault charges, the exclusion of the details underlying the theft report deprived Bautista of the right to present evidence directly relevant to his defense of the kidnapping charge. We therefore uphold the district court's handling of the theft report evidence as to the sexual assault charge but reverse and remand for retrial on the kidnapping count.

Our analysis begins with the relevant statutes. As Bautista emphasizes, Nevada law permits the admission of "[e]vidence of the character or a trait of character of the victim of the crime offered by an accused." NRS 48.045(1)(b). However, such evidence is subject to Nevada's rape shield statute, which provides that, in "any prosecution for sexual assault or statutory sexual seduction or for attempt to commit or conspiracy to commit either crime," NRS 50.090, the victim's previous sexual conduct is not admissible to challenge the victim's credibility or to prove consent to the sexual encounter (unless the court has already admitted evidence about such conduct from the victim or the State). *Id.; see* NRS 48.045(1)(b), (c). Notably, NRS 50.090 does not address use of such evidence in other types of cases, such as kidnapping. *Cf. State v. Wyatt,* 84 Nev. 731, 734, 448 P.2d 827, 829 (1968) ("The mention of one thing implies the exclusion of another."). Finally, even when character or a trait of character is admissible, NRS 48.055 and NRS 50.085 restrict the methods of proving it.

The legal and logical relevance of the theft report evidence to the sexual assault charges is attenuated, at best. Nothing in the theft report suggests that M.C.'s allegation of having been the victim of a theft at the Virgin River Hotel and Casino was false. On the contrary, that part of M.C.'s report appears truthful. The district judge allowed Bautista to establish that M.C. had lied to the police on a prior occasion. The only remaining relevance of the theft report incident to the sexual assault charges was to support an inference that, having consented to sex as a prostitute on another occasion, M.C. likely consented to the sexual encounter(s) between her and Bautista at the abandoned restaurant and burned-out car. This use of that evidence, however, is flatly interdicted by NRS 50.090 as, indeed, Bautista conceded in the district court.

> [FN 3] *Drake* contains broad language to the effect that Nevada's rape shield statutes do not apply when evidence relates to a victim's prostitution. 108 Nev. at 526, 836 P.2d at 54 (stating that an arrest record for prostitution showing "a long-standing pattern of criminal dishonesty and sexual crimes" falls outside NRS 48.069 and NRS 50.090). Bautista's concession that he did not seek to admit evidence of M.C.'s admitted act of prostitution at the Virgin River Casino distinguishes *Drake*. Also distinguishable is *Cox,* where the victim applied for an escort license after the alleged assault, and this court reversed the district court's exclusion of that evidence, reasoning that the evidence was offered not to prove consent, but to show that the victim invented the charge of rape after the defendant refused to pay her the money she demanded of him. 102 Nev. at 255-56, 721 P.2d 359-60. No similar facts or arguments were made as to the sexual assault charges in this case.

Thus, we find no legal error or abuse of discretion as to the limitations the district court placed on Bautista's use of the theft report evidence in defense of the sexual assault charges.

[FN 4] Although Bautista argued otherwise in his opening brief, the record does *not* support the claim that M.C. had previously made false accusations of rape, as Bautista acknowledged in reply. *Miller v. State,* 105 Nev. 497, 500, 501, 779 P.2d 87, 89 (1989), therefore, does not assist him on his appeal of his sexual assault conviction because, unlike *Miller,* the complainant does not have a history of making false sexual assault allegations.

The same analysis does not apply to the kidnapping charge. While the rape shield statute prohibits use of M.C.'s prostitution activity to establish consent to the sexual encounter at the burned-out car scene, the fact M.C. allegedly invented the abduction to explain how she came to be at the burned-out car scene has parallels to her admitted lie about being unexpectedly accosted outside and/or forced into a stranger's room at the Virgin River Casino that cannot be ignored. M.C.'s willingness to accompany a stranger alone into an isolated situation and thereafter, when she was victimized, to lie about the voluntariness of her decision to go with the stranger, in order to bolster her victim's report, went to the heart of Bautista's defense to the kidnapping charge. In Bautista's view, this evidence was relevant and admissible, even crucial, because it demonstrated M.C.'s motive to lie, *see* NRS 48.045(2) (prior bad act evidence may not be used to demonstrate propensity but is admissible to prove motive), because it cast doubt on the credibility of her kidnapping allegation, *see* NRS 48.055(2) (allowing inquiry into specific acts on direct or cross-examination when character or a trait of character is "an essential element of a . . . defense"), and because it refuted the false impression that M.C. was a naif, whose impairment and distress had been taken advantage of, against her will, by Bautista, NRS 48.045(1)(b),(c); NRS 50.085(3). We agree.

Bautista wanted to bring out M.C.'s lie about being forced into the hotel room and its shower to show that she would lie about being abducted, the better to press a criminal charge, and that this was why she falsely accused him of forcing her into his SUV. Such nonpropensity use of prior specific-instances evidence to show motive is proper under NRS 48.045(2). *See also Sussman v. Jenkins*, 636 F.3d 329, 357 (7th Cir. 2011) (allowing specific-instance evidence because it "expose[d] a motive to fabricate a specific kind of lie under a specific set of circumstances"); *Redmond v. Kingston*, 240 F.3d 590, 591 (7th Cir. 2001) (prior false allegation of rape to get attention should have been admitted as proof of motive to accuse the defendant falsely).

The false charge imbedded in M.C.'s prior theft report did more than raise a generalized question about her credibility. The jury reasonably could have analogized M.C.'s motive to lie about being forced into a hotel room to take a shower to her motive to lie about being forced into Bautista's SUV and driven, against her will, to the abandoned restaurant and burned-out car sites. These details of the theft report incident had distinct probative value to Bautista because the kidnapping charge depended completely on M.C.'s word against Bautista's. *See Sussman*, 636 F.3d at 356-57 (specific-instances evidence should have been allowed to be inquired into where the point was not simply to expose prior untruthfulness, generically, but to reveal "'possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand'" (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974))); *State v. Miller*, 921 A.2d 942, 948-49 (N.H. 2007) (analyzing the use of specific-instances evidence in fabricated-charge cases); *see generally* 28 Charles Alan Wright

& Victor James Gold, *Federal Practice and Procedure* § 6118 at 94-97 (1993) (noting that the factors involved in assessing the propriety of specific-instances evidence under the federal counterpart to NRS 50.085 include "whether the testimony of the witness in question is crucial or unimportant, the extent to which the evidence is probative of truthfulness or untruthfulness, the extent to which the evidence is also probative of other relevant matters, the extent to which the circumstances surrounding the specific instances of conduct are similar to the circumstances surrounding the giving of the witness's testimony, the nearness or remoteness in time of the specific instances to trial, the likelihood that the alleged specific-instances of conduct in fact occurred, the extent to which specific-instances evidence is cumulative or unnecessary in light of other evidence already received on credibility, and whether specific-instances evidence is needed to rebut other evidence concerning credibility").

*State v. Martin*, 44 P.3d 805 (Utah 2002) is analogous. In *Martin*, the court allowed evidence that a victim had previously accepted a ride from a stranger and accompanied the stranger to his home, despite the rule against character propensity evidence. *Id.* at 815. There, the principal evidence introduced at Martin's trial for kidnapping, rape, and forcible sodomy were the conflicting accounts given by Martin and his alleged victim, Lorraine Egan. *Id.* at 806. Naturally, the parties' accounts varied considerably. *Id.* at 806-09. While Martin testified that Egan voluntarily rode with him in his truck and consented to engage in sexual acts, *id.* at 808-09, Egan claimed she was handcuffed, forced into the truck, and made to perform sexual acts against her will. *Id.* at 806-08.

The court explained that the evidence Egan accompanied a stranger was relevant because "[i]t is reasonable to believe that a person who has accepted a ride from a stranger in the past may do so again." *Id.* at 812. The court continued that the evidence did not constitute impermissible character propensity evidence, because it rebutted the State's evidence of Egan's dependability and the State's "'common sense'" argument that Egan's testimony constituted the correct version of the events. *Id.* at 812-13. Given that credibility was a crucial issue in the case, the court concluded that the evidence may have "constitute[d] the difference between conviction and acquittal." *Id.* at 817.

A question as to the admissibility of evidence can be either a question of discretion, which we review for abuse, or a question of law, which we review for correctness. While we find no error or abuse as to the district court's handling of the theft report evidence as it pertained to the sexual assault charges, we do find error as to the use of that evidence as it pertained to the kidnapping charge.

> [FN 5] We recognize that the joinder of kidnapping and sexual assault charges complicated the evidentiary decisions facing the district court. As Bautista urged, however, the district court could and should have allowed him to develop the facts underlying the theft report without going into the prostitution issue, the irrelevance and inadmissibility of which he conceded.

Given the closeness of the evidence as to the kidnapping charge, the error cannot be said to be harmless.

(ECF No. 15-5 at 5-17.)

### d.      Analysis of Ground 2(A)

The NSC correctly identified the clearly established federal law but objectively reasonable jurists would agree that it unreasonably applied it by determining "the only remaining" relevance of the May 2009 incident to the sexual assault charge, was "to support an inference that, having consented to sex as a prostitute on another occasion," M.C. "likely consented to the sexual encounter(s) between her and Bautista at the abandoned restaurant and burned-out car." *See supra* at 20.

Bautista's defense was that M.C. willingly entered his vehicle and willingly engaged in sexual activity with him. M.C.'s lie to the police in May 2009 about whether she consented to enter the hotel room where her purse and camera were stolen was relevant to show that, contrary to her portrayal at trial as a naïve handicapped woman, she had the capacity to lie about whether her actions were volitional. Her willingness to lie about whether her actions were volitional makes it more probable she was willing to lie about whether she consented to not only getting into Bautista's vehicle, but also consented to sexual activity with him.[4] And during argument on rebuttal, the prosecutor argued, "Is [M.C.] sophisticated enough to craft all this?" (ECF No. 13-1 at 178.) Without eliciting that M.C. engaged in sex and prostitution in that hotel room in May of 2009, reasonable jurists would agree that a reasonable jury might have received a significantly different impression of M.C.'s credibility concerning whether she consented to sexual activity with Bautista had the jury been exposed to evidence that M.C. was willing and sophisticated enough to lie about whether her actions were volitional. *See Olden*, 488 U.S. at 232 (citing *Delaware*, 475 U.S. at 680).

Applying *de novo* review, the Court finds the trial court's limitation on the cross-examination was unreasonable, arbitrary, or disproportionate to the purposes the restrictions were designed to serve. The trial court's limitation prohibiting Bautista from cross-examining M.C. about the fact that she engaged in sex and prostitution in the hotel

---

[4]Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS § 48.015.

room was appropriate because trial counsel conceded such testimony was more prejudicial than probative, and nothing indicates M.C. lied to police about whether she had sex with the man or prostituted herself. However, the trial court restricted cross-examination to whether M.C. made a false report to the police. That restriction is unreasonable, arbitrary, and disproportionate to the purposes of the restrictions on the cross-examination because it prevented Bautista from cross-examining M.C. about the fact that she lied to the police about whether she entered the hotel room of her own volition. Such evidence was highly probative of Bautista's defense (that M.C. both consented to enter his vehicle and consented to have sex with him) because it demonstrated that M.C. had the sophistication to lie about whether her actions were volitional for purposes of the sexual assault charge. Such cross-examination would not have constituted harassment or caused prejudice or confusion of the issues. And it would not have threatened M.C.'s safety or have been repetitive or only marginally relevant. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The trial court's restrictions on the cross-examination violated Bautista's rights to due process, to confront and cross-examine witnesses, and to present a complete defense, under the Sixth and Fourteenth Amendments.

"A federal court may not grant habeas relief to a petitioner in state custody unless the petitioner surmounts both AEDPA deference as set forth in 28 U.S.C. § 2254(d) and the test for prejudice as set forth in *Brecht.*" *Frye v. Broomfield*, 115 F.4th 1155, 1162, (9th Cir. 2024) (citing *Brown v. Davenport*, 596 U.S. 118, 122 (2022)). *Brecht* requires the error to have "had [a] substantial and injurious effect or influence in determining the jury's verdict." *See Waidla v. Davis*, No. 18-99001, 2024 WL 5196398, at *20 (9th Cir. Dec. 23, 2024) (citing *Brecht v. Abramson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Whether constitutional error had a "substantial and injurious effect or influence in determining the verdict" requires consideration of the following factors: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence

corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See Van Arsdall*, 475 U.S. at 684 (listing factors relevant on direct review to whether a violation of a defendant's Sixth Amendment right to cross-examination is harmless beyond a reasonable doubt). The Court finds these factors compel a finding that the constitutional error substantially influenced the jury's verdict.

The cross-examination was important because it struck at the heart of the consent defense, undermining the victim's credibility by establishing she has the capacity to lie about whether her actions are volitional. The testimony was not cumulative because there was no similar evidence or testimony and there was no independent corroborating or contradicting evidence on material points related to the issue of consent. Although the defense was permitted to cross-examine M.C. about whether she previously made a false police report, the defense was not permitted to elicit her testimony that she lied to police about whether she voluntarily entered a hotel room where her purse and camera were stolen, to demonstrate M.C. had the capacity and sophistication to lie about whether her actions were volitional. The State's case was wholly dependent upon M.C.'s credibility as the physical evidence was not conclusive on the primary issue disputed at trial: whether M.C. consented to anal sex with Bautista.

Thus, the Court finds the violation of Bautista's rights to due process, to confront and cross-examine witnesses, and to present a complete defense, had a substantial and injurious effect on the determination of the verdict. Bautista is entitled to federal habeas relief for Ground 2(A).

### 2.    Grounds 2(B) and 2(C): Cross-Examination of Bautista[5]

Bautista alleges the State's cross-examination regarding his post-*Miranda*[6] silence and privileged communications with counsel, violated the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 34 at 24.)

---

[5]The NSC addressed these claims together.

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

### a.   Additional Factual Background

In opening statements, defense counsel argued, "Mr. Bautista has never had a chance to tell his story about what happened, but he is going to tell it to you in court . . . ." (ECF No. 11-1 at 253.) In support of that theory, defense counsel elicited testimony that Detective Hoggard did not give *Miranda* warnings to, interview, or question, Bautista about the case when she met him to retrieve his buccal swab. (ECF No. 12-1 at 131-32.) Defense counsel elicited Detective Richmond's testimony that he provided a *Miranda* warning and asked Bautista only a few questions:

> Q. And you went and you approached my client?
> A. Yes, sir.
> Q. And you asked him if he had ever seen the girl before?
> A. I did.
> Q. And in English he responded, "I gave her a ride home in October."
> A. That's correct.
> . . . .
> Q. So at that point in time, he had not demonstrated an unwillingness to be cooperative with you?
> A. Correct.
> Q. And then you *Mirandized* him, correct?
>    You gave him his constitutional right as you testified to?
> A. Yes.
> Q. And then, on direct examination, you said you didn't ask him any other questions, but, in fact, isn't it true that you forgot one question that you didn't [sic] ask him, which was: Which car are you driving?
> A. Well, it was in my report that I did ask him what car he was driving, yes.
> Q. Okay. And he answered that question?
> A. Yes.
> . . . .
> Q. And those were the only questions you asked him?
> A. Yes, sir.
> Q. You made a determination not to ask him any additional questions at that time?
> A. Other than what I just previously testified to as far as once we covered the identification of his person.

(*Id.* at 208-09, 211.)

Before Bautista testified, defense counsel agreed the defense's opening statements and cross-examination of the detectives opened the door to fair cross-examination and comment in closing remarks about Bautista's post-*Miranda* silence:

> [BY THE STATE]: Judge, just one and I believe we're in agreement on, and I just want to put it on the record.
>
> Based on [Defense Counsel]'s opening that the Defendant was not given the opportunity to tell his side of the story until today, based on the questioning of Detective Hoggard and Richmond about him not being questioned, it's the State's position that no longer is the State restricted in its comments upon post arrest silence, and I spoke to [Defense Counsel] about that, and he is in agreement that that is going to be subject to fair cross-examination and fair comment at closing.
>
> THE COURT: Okay.
>
> I mean, I think you both are exactly correct that based upon how the testimony has developed, I think you are exactly correct, and that that's exactly what you guys have agreed to.
>
> [DEFENSE COUNSEL]: And we are going to comment on it as well.
>
> THE COURT: Okay, that's fine.

(ECF No. 13-1 at 9-10.)

On direct examination, Bautista testified he was willing to answer questions and never refused to talk to the police. (*Id.* at 120-21.) On cross-examination, Bautista said he did not tell his story to the police because they did not ask him:

> Q: You heard [Detective Richmond] testify that . . . he read you your *Miranda* warnings?
>
> A: Yes, he said that he read them, but he just showed me a card.
>
> Q: Okay. And you made no further statements after that?
>
> A: No.
>
> Q: And at that point he also informed you that you were under arrest for sexual assault?
>
> A: Exactly.
>
> Q: And it's your testimony today that you said nothing after that?
>
> A: After—after what?
>
> Q: You are in handcuffs?
>
> A: Okay.
>
> Q: You are being told you are under arrest for sexual assault?
>
> A: Okay.
>
> Q: And it's your testimony today that the only thing that you told Detective Richmond about is that you gave her a ride—that you gave her a ride?

27

A: Yes, exactly.

Q. Did you want to say something at that point?

A. I couldn't.

Q. Was there tape on your mouth?

A. They know that I don't speak fluent English.

. . . .

Q. But when it comes to talking to Detective Richmond, you didn't understand anything?

     Yes or no?

. . . .

A. Well, yeah, I spoke to him in English.

Q. Okay. So they are taking you to jail for sex assault?

A. Exactly.

Q. You don't say, hey, Bud, can I explain?

A. No.

Q. You don't, do you?

A. No.

Q. You have an arraignment up in Mesquite. Your paper with your charges is read to you in Spanish?

A. Exactly.

Q. And you don't try to explain then?

A. No.

Q. You are informed that the case is going to the grand jury?

A. Exactly.

Q. You have notice of that?

A. Yes.

Q. And that notice tells you that you are allowed to testify if you so choose?

A. Exactly.

Q. And you didn't do that?

A. And no one came to talk to me. No one came to talk to me except my attorneys.

Q. Okay.

     Did you tell your attorneys you want to talk to these detectives and explain?

A.  With the detectives?

Q. Yes.

A. If they would have given me the chance. They never asked me how it was, what happened, what I did. They told me—they told me I am charged with sexual assault, and you are going to prison.

Q. Okay.

A. That's all that I heard.

Q. So Detective Hoggard comes and sees you with a warrant to collect that [buccal swab]?

A. Exactly.

Q. She hands you the warrant.

A. Yes, and in English.

Q. Okay.

    And you don't try to talk to her while she is standing there?

    You don't?

A. No.

Q. No.

A. No, I don't want to.

Q. Does she—

A. I just ask—I just ask what it is all about, and what that paper indicated, and I want to cooperate, exactly.

Q. Okay. So you didn't want to tell her at that time what happened?

A. She never asked.

. . . .

Q. Would you agree with me you didn't have to wait to be asked?

    Yes or no?

A. Yes.

(*Id.* at 92-115.)

On redirect examination, Bautista testified he attempted to answer all the questions

of the police and he was always willing to speak with them about the case:

Q. Now, the District Attorney asked you a lot of questions about your conversations with the police officers?

A. Yes.

Q. Did you do your best to answer every question they asked you?

A. Exactly.

Q. Did you expect them to ask you additional questions?

A. I think so.

Q. Do you know how police officers do their job?

A. I think that they have to question the witness before he is arrested.

Q. And did they question you?

A. When?

Q. When you were arrested?

A. Yes, I was asked.

Q. A few limited questions?

A. Exactly.

Q. And you did your best to answer them?

A. Yes.

. . . .

Q. Have you ever refused to speak to a police officer about what happened in this case?

A. I never talk to a police officer about this case.

Q. They never asked you any questions about this case, is that right?

A. That's right.

Q. But you were always willing to talk to them?

A. Yes, I was willing to answer.

(*Id.* at 118-21.) On re-cross-examination, the State elicited Bautista's agreement that the police never told him he couldn't talk to them about the case. (*Id.* at 121-22.) The instructions to the jury did not explain the Fifth Amendment privilege. (ECF No. 14-1.)

In closing argument, the State did not mention Bautista's post-arrest silence or communications with counsel. (ECF No. 13-1 at 135-48.) The defense argued that "[Bautista] expected them to ask more questions, but they never did. Is that his fault?" (*Id.* at 168-69.) The defense argued Bautista fully cooperated and there was no evidence he had a guilty conscience. (*Id.* at 160, 167-70.) In rebuttal, the State argued Bautista's failure to disclose his story until trial permitted him to tailor his testimony to the evidence:

> [Mr. Bautista] doesn't [provide an explanation for the charges] until he has what every piece of evidence is. He gets the benefit of twisting the absence of evidence, and he gets to play a little game, follow a little rule. Admit what you can't deny, deny what you can't admit . . . . He has had the opportunity to hear every piece of evidence and make sure his story fits. But that's the police's fault because they just never bothered to ask him. He is in a police car, is handcuffed, been told he has been charged with sex assault, and it just doesn't occur to go, ah, wait, timeout. He wanted to know how it ends . . . .

(*Id.* at 176-77.)

### b.    State Court's Determinations

On direct appeal, the NSC determined Bautista agreed the State could comment on Bautista's *post-Miranda* silence, confirmed the decision was strategic, and waived

objection that the State exceeded the bounds of fair questioning and comment, and Bautista's testimony about his exchanges with counsel was not error as it was ambiguous, arguably not solicited by the question asked, and quite brief:

> Acting on M.C.'s call, the police went to the Virgin River Casino and found Bautista, who gave them a false name, "Jose." They detained him while a detective drove M.C. to the casino. When M.C. arrived, she identified Bautista as her assailant. Asked if he recognized M.C., Bautista said he had given her a ride several months earlier.
>
> [FN 1] Bautista does not challenge his detention or *pre-Miranda* questioning.
>
> [D]uring opening statement, defense counsel stated that, "Mr. Bautista has never had a chance to tell his story about what happened, but he is going to tell it to you in court, and he will tell you his side of the story." Defense counsel also cross-examined the detectives the State called and had them confirm that they did not ask Bautista questions beyond those related above concerning Bautista being acquainted with M.C. and his name and identification.
>
> Bautista testified at trial. Before he did, the State made a record, outside the presence of the jury, of its agreement with defense counsel that it could question Bautista about his post-arrest silence:
>
>> Based on [defense counsel's] opening that the Defendant was not given the opportunity to tell his side of the story until today, based on the questioning of [the detectives] about him not being questioned, it's the State's position that no longer is the State restricted in its comments upon post arrest silence, and I spoke to [defense counsel] about that, and he is in agreement that that is going to be subject to fair cross-examination and fair comment at closing.
>
> Defense counsel acknowledged that this was their agreement. He also stated: "And we are going to comment on it as well."
>
> Under direct examination, Bautista testified that his conversations with the detectives confused him because they were conducted in English, not Spanish, his native tongue, and that neither detective asked him questions about his relationship with M.C. The State cross-examined Bautista extensively. It established that he did not volunteer his version of the events to the detectives; it also had him confirm that he did not testify before the grand jury or say anything at arraignment beyond "not guilty." When asked about not giving his side of the story to the detectives while in jail, Bautista stated, "[N]o one came to talk to me. No one came to talk to me except my attorneys." The State then asked:
>
>> STATE: Okay. Did you tell your attorneys you want to talk to these detectives and explain?
>>
>> DEFENDANT: With the detectives?
>>
>> STATE: Yes.
>>
>> DEFENDANT: If they would have given me the chance. They never asked me how it was, what happened, what I did. They told me—they told me I am charged with sexual assault, and you are going to prison.

31

Defense counsel made no objection to these questions until, at the very end, he interposed an "asked and answered" objection.

. . . .

Bautista next contends that the State violated his Fifth Amendment rights by questioning him regarding his *post-Miranda* silence. At trial, the State may not question the defendant's choice to remain silent after receiving *Miranda* warnings. *Gaxiola v. State,* 121 Nev. 638, 655, 119 P.3d 1225, 1237 (2005). Such questioning is not harmless error when the case rests on the word of the defendant versus the word of the victim. *Id.* However, under the curative admissibility doctrine, if the defendant brings up inadmissible evidence, the prosecutor can then offer inadmissible evidence in response. *Taylor v. State,* 109 Nev. 849, 856-57 n.1, 858 P.2d 843, 848 n.1 (1993).

Comment on *post-Miranda* silence is typically intended "to prejudice the defendant by attempting to create an inference of guilt in the jury's mind." *United States v. Wycoff,* 545 F.2d 679, 681 (9th Cir. 1976). Therefore, the potential for prejudice to the defendant is high. In addition, when "the government's comments are far broader than a mere response to defense questioning, the error in commenting on *post-Miranda* silence is not invited." *United States v. Lopez*, 500 F.3d 840, 844 n.3 (9th Cir. 2007).

The problem in applying these precepts to this case is that defense counsel agreed on the record that the State could comment on Bautista's *post-Miranda* silence, confirmed that the decision was strategic, and did not interpose any relevant objection when the State appeared to exceed the bounds of fair comment, including its elicitation of Bautista's conversations with his attorneys and its unfair question about Bautista not speaking up at arraignment to give an account of what truly occurred. Bautista's failure to object in the face of this cross-examination—especially given the agreement between the defense and the State concerning comment on Bautista's *post-Miranda* silence—establishes the breadth of the agreement, not a violation of its terms. This constitutes waiver of the objection, not mere negligence to which plain error review might apply.

Eliciting matters protected by the attorney-client privilege, however, exceeded the agreement represented on the record. This privilege is statutory, not constitutional, although government intrusion into the attorney-client relationship may violate a defendant's Sixth Amendment rights. *Manley v. State,* 115 Nev. 114, 121, 979 P.2d 703, 707 (1999). Substantial prejudice is required to implicate the Sixth Amendment. *Id.* at 122, 979 P.2d at 707. Here, Bautista's response about his exchanges with his attorneys was ambiguous, arguably not solicited by the question he was asked, and quite brief. In addition, Bautista failed to object or move for a mistrial. On their own, the State's questions about exchanges between Bautista and his attorneys do not amount to plain error or result in substantial prejudice.

(ECF No. 15-5 at 4-5, 7-9, 17-19.)

### d.    Analysis of Ground 2(B)

"The Fifth Amendment right to remain silent contains an implicit assurance 'that silence will carry no penalty.'" *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). "[I]t would be

fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* (footnote reference omitted). "When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, [a] court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt." *United States v. Bushyhead*, 270 F.3d 905, 913 (9th Cir. 2001) (quoting *People of Territory of Guam v. Veloria*, 136 F.3d 648, 652 (9th Cir. 1998)).

"Under the rule of curative admissibility, or the 'opening the door' doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *Jerden v. Amstutz*, 430 F.3d 1231, 1239 n.9 (9th Cir. 2005) (quoting *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988)) (citation omitted). The Ninth Circuit has thus "interpreted *Doyle* to allow prosecutors to comment on post-*Miranda* silence in response to defense arguments." *See Cook v. Schriro*, 538 F.3d 1000, 1022 (9th Cir. 2008) ("By electing to dwell on the justifications for petitioner's silence after arrest, defense counsel opened the door for the prosecutor to suggest contrary inferences." (citing *Bradford v. Stone*, 594 F.2d 1294, 1296 (9th Cir. 1979))); *see also United States v. Robinson*, 485 U.S. 25, 31 (1988) (holding that "prosecutor's statement that respondent could have explained to the jury his story did not in the light of the comments by defense counsel infringe upon respondent's Fifth Amendment rights.").

Bautista alleges this Court must review this claim *de novo* because the NSC, having found the Fifth Amendment Privilege waived, failed to address the claim on the merits. (ECF No. 68 at 46-47.) Alternatively, he argues the NSC's decision is based on an unreasonable determination of fact and is contrary to *Doyle*, 426 U.S. 610. *De novo* review is not warranted for Ground 2(B) because the NSC's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law

as determined by the Supreme Court and are not based on an unreasonable determination of fact considering the evidence presented in the state-court proceeding.

The NSC was reasonable in its determination that the defense opened the door and stipulated to the State's cross-examination and closing remarks concerning Bautista's post-*Miranda* silence by arguing in opening remarks that Bautista did not get an opportunity to tell his side of the story before trial and pursuing that theory by eliciting testimony from the detectives that they failed to ask Bautista about the offense. These actions support the reasonableness of the determination that the stipulation was strategic. Additionally, defense counsel confirmed the stipulation was strategic by agreeing counsel's actions opened the door to the State's fair cross-examination and comment on Bautista's post-*Miranda* silence, asserting the defense would "comment on it as well," and thereafter eliciting Bautista's testimony that he would have talked to the police about the offense but was not given an opportunity to do so. It was also reasonable to conclude that Bautista waived a claim that the State went beyond fair cross-examination when it elicited Bautista's admission that he did not present his side of the story to the grand jury, at arraignment, or speak with his attorneys about talking with the police. Considering the defense strategy, it was reasonable to construe the failure to object to this line of questioning was part of the intentional relinquishment of a known right that extinguished the error and precluded appellate review. *See United States v. Olano*, 507 U.S. 725, 733 (1993).

For the foregoing reasons, the NSC did not unreasonably apply *Doyle*. Bautista is not entitled to federal habeas relief for Ground 2(B). The Court will, however, issue a Certificate of Appealability for Ground 2(B) as reasonable jurists could conclude the Court's assessment of the constitutional claim is debatable or wrong. *See Slack*, 529 U.S. at 483-84.

### e.    Analysis of Ground 2(C)

"[S]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Evans v. Skolnik*, 997 F.3d 1060, 1068 (9th Cir.

2021) (citing *Partington v. Gedan*, 961 F.2d 852, 863 (9th Cir. 1992) and *Sanborn v. Parker*, 629 F.3d 554, 575 (6th Cir. 2010) ("A violation of the attorney-client privilege is not itself a violation [] of the United States Constitution or its laws and treaties.")). *See also Lange v. Young*, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989) (holding that "[e]ven if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for [habeas] relief.").

"[Although] the attorney-client privilege is merely a rule of evidence . . . , government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights." *Bittaker v. Woodford*, 331 F.3d 715, 724 n.7 (9th Cir. 2003) (quoting *Clutchette v. Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985)). *See also United States v. Castor*, 937 F.2d 293, 297 (7th Cir. 1991) ("Where the sixth amendment right to attorney-client confidentiality exists, prosecutorial violation of that privilege might lead to reversal of a resulting conviction if the defendant could show prejudice.")

The NSC reasonably determined that it was ambiguous whether Bautista responded to the question whether he communicated to his counsel a desire to speak with the police:

> Q. Did you tell your attorneys you want to talk to the detectives and explain?
> A. With the detectives?
> Q. Yes.
> A. If they would have given me the chance.
>      They never asked me how it was, what happened, what I did. They told me—they told me I am charged with sexual assault, and you are going to prison.
> Q. Okay.
> A. That's all that I heard.

(ECF No. 13-1 at 112-13.) In the context of his testimony, it would be reasonable to conclude Bautista meant the detectives when he used the word "they." Otherwise, Bautista's response would lead to an unreasonable conclusion that his counsel never asked him "what happened" and nothing in the record indicates defense counsel failed to

communicate with Bautista or prepare the defense. Moreover, Bautista testified that Detective Richmond told him he was under arrest for sexual assault, and it appears that Bautista, by clarifying that the State was referring to whether he would explain his story to the detectives, averted disclosure of his communication with his counsel by stating instead that the detectives never asked him what happened with M.C. (ECF No. 13-1 at 84, 109-10, 112.) Because the response is at most ambiguous, and it is alternatively reasonable to construe Bautista's response as not divulging any attorney-client privileged communication at all, it was reasonable for the NSC to determine that, as counsel did not object or move for a mistrial, the brief response was arguably not solicited by the question that was asked, and the State's questions about exchanges between Bautista and his attorneys did not prejudice Bautista.

Bautista alleges AEDPA deference is inapplicable because the NSC failed to address the merits of his claim that the State's cross-examination shifted the burden of proof to Bautista to prove his innocence.[7] (ECF No. 68 at 60-61.) The Supreme Court has held that when a state court addresses some but not all a petitioner's claims, the federal court on habeas review must presume, subject to rebuttal, that the unaddressed claims were adjudicated on the merits, thereby warranting AEDPA deference. *Johnson v. Williams*, 568 U.S. 289, 300-01 (2013). The presumption can be rebutted in "limited" or "unusual circumstances." *Id.* at 301-02. For example, the presumption does not stand if the federal claim was "rejected as a result of sheer inadvertence." *Id.* at 302-03. To show this, however, "the evidence" must "very clearly" lead to "the conclusion that a federal claim was inadvertently overlooked in state court." *Id.* at 303. Where no decision from the state court explains its underlying reasoning, a federal habeas court must "engage in an independent review of the record" to determine whether the state court's decision on the claim was "objectively unreasonable." *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020) (citing *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) (quoting *Walker v. Martel*, 709

---

[7]Bautista's burden-shifting argument appears to have been argued only in connection with Ground 2(C), not Ground 2(B). (ECF No. 22 at 28-29.)

F.3d 925, 939 (9th Cir. 2013) (relying on *Harrington*, 562 U.S. at 99-101)). "This is not de novo review;" rather, it must be determined "what arguments could have supported the state court's decision and assess whether fairminded jurists could disagree whether those arguments are unreasonable." *Kipp*, 971 F.3d at 948; *see also Harrington*, 562 U.S. at 102.

Bautista fails to rebut the presumption that the NSC adjudicated the merits of the burden-shifting portion of this claim. In Bautista's opening brief on direct appeal, he alleged the State's inquiry into attorney-client communication "abrogated" his attorney-client privilege and "amounted to improper burden shifting," in violation of due process. (ECF No. 14-20 at 28-29.) Bautista did not reply to the State's argument on this point. (ECF No. 15-3.) In its decision, the Nevada Supreme court noted: "We have considered and rejected Bautista's remaining assignments of error." (ECF No. 15-5 at 23.) Bautista did not petition the NSC for rehearing on the grounds that it overlooked the burden-shifting portion of his claim. Accordingly, Bautista fails to overcome the presumption that the NSC adjudicated the burden shifting portion of his claim. Turning to the merits, the NSC could reasonably determine the cross-examination about Bautista's communication with counsel did not ask Bautista to prove his innocence; rather the questions were designed to refute Bautista's claim that he was never given an opportunity to provide his side of the story until his testimony at trial.

For the foregoing reasons, Ground 2(C) is denied.

### 3.      Ground 2(D): Expert Vouching

Bautista alleges the trial court erred by allowing the sexual assault nurse to, in violation of due process and a fair trial under the Fifth and Fourteenth Amendments, support M.C.'s credibility by suggesting that the injury more likely resulted from a forcible sexual encounter because M.C.'s anal injury was consistent with nonconsensual sex. (ECF No. 34 at 30.)

///

///

### a.    Additional Background

Nurse Young testified on direct and cross-examination that she did not determine whether M.C.'s sexual activity was consensual:

> [BY THE STATE]:
>
> Q. [A]nd you in your job duties don't make any determination as to whether or not it was consensual, or not, or anything like that, is that correct?
>
> A. Right. My job is to look for forensic evidence of trauma and document that.
>
> . . . .
>
> [BY DEFENSE COUNSEL]:
>
> Q. And from what you observed in your training and experience, is it fair to say that you don't know if this trauma to [M.C.] was caused by consensual or non consensual sex?
>
> A. I don't determine that. It's possible that the injuries could be caused by the anus being too tight.

(ECF No. 12-1 at 146, 155.) On redirect examination, Young volunteered that her findings were consistent with M.C.'s story, and the trial court clarified Young's findings were consistent with either consensual or nonconsensual penetration:

> [BY THE STATE]:
>
> Q. [N]ow, lastly, counsel had asked you about drawing a conclusion as to whether or not this is consensual or not, and your answer was that that's not your place. You don't make that conclusion, but based on your examination, were your findings consistent—
>
> [DEFENSE COUNSEL]: (Interposing) Objection. Can I approach?
>
> . . . .
>
> THE COURT: All right. Go ahead, proceed. You are not to ask that question.
>
> [BY THE STATE]: Right.
>
> Q: Sitting here today, you cannot give us an opinion one way or the other as to whether or not this was consensual or non consensual, correct?
>
> A: The injuries that I saw were consistent with what she was telling me.
>
> [BY THE COURT]:
>
> Q: Well, I think that earlier you said you couldn't tell from what you observed whether it was consensual or non consensual during your examination that you determined that. Is that inaccurate? That was your answer to the question?
>
> A: That's what I said, yeah.
>
> Q: So, in other words, what you are saying is you can't tell from your examination whether it's the sex was consistent or not consistent with

1     consensual. But also, what the State is asking you, it was, if you just reverse
      that, it was still consistent with her version of it?

2     A: Yes.

3     Q: But it could also be consistent with another version?

      A: But she didn't tell me the other version.

4     Q: Right.

5     A: She only told me one version.

6     Q: But that doesn't eliminate the fact that if [sic] it was also not inconsistent
      with another man or occurrence, is that fair?

7     A: Yes.

8    (*Id.* at 158-59.) The trial court did not give the jury a curative instruction. At recess,

9    Bautista objected that Young vouched for M.C. when she testified her findings were

10   consistent with M.C.'s version of the events:

11        [DEFENSE COUNSEL]: I think the last question and answer from the expert
          was improper. There is a long line of cases in Nevada. There's *Lickey v.
12        State*, 108 Nev. 191.

13        THE COURT REPORTER: What was the name of the case again?

          [DEFENSE COUNSEL]: Lickey, L-i-c-k-e-y v. State, *Townsend v State*,
14        which is 103 Nev. 113.

15        THE COURT: 113, Nev. 113.

          [DEFENSE COUNSEL]: And *Marvele v. State*, M-a-r-v-e-l-e, 114 Nev. 921.

16        THE COURT: Was the first one *Lickey*?

17        [DEFENSE COUNSEL]: Yes.

          THE COURT: That was the first one. What is the citation for it?

18        [DEFENSE COUNSEL]: 108 Nev. 191.

19        They all state it's improper for an expert witness to vouch for the veracity of
          another witness's statements, such as—and I believe that's what she was
20        doing by saying, yes, this supports her story.

21        She is vouching for the witness saying in my expert opinion, that person is
          truthful, and that's why I think that is improper.

22        THE COURT: Okay. I don't think that is what she said. I think she said that
          her findings would not be consistent with her story.

23        [THE STATE]: That's correct.

24        THE COURT: I think that [if] the testimony was my findings are that her story
          was truthful. You would get your objection sustained.

25             If the question—if the answer to the questions are, are your findings
26        consistent with her story?

               Yes. But she also testified, her findings are also consistent with other
27        mechanisms of the same occurrence so—

28        [DEFENSE COUNSEL]: I'm just saying I think she was too close to the line
          if not over the line.

                                        39

THE COURT: Well, it was pretty close to the line, and we do that all the time, I mean, it happens all the time when we are talking about experts, and the expert testimony in regards to the examination of the victim.

I think it's done, I mean, if it's done properly, then it's not objectionable.

She answered it all right. Anything else?

[DEFENSE COUNSEL]: That's it.

(*Id.* at 161-63.)

In closing argument, the State did not mention the objected-to portion of the nurse's testimony. However, defense counsel argued that "[t]he rectal tear and abrasion to [M.C.]'s anus. It exists. But what does it tell you. It tells you there was penetration. They can't say whether it was sexual assault or consent" and the "nurse examination was done, and evidence was collected, none of which supports that a sexual assault occurred." (ECF No. 13-1 at 158, 161.) On rebuttal, the State did not respond to that argument or mention that portion of the nurse's testimony.

### b.    Applicable Standards

The Supreme Court leaves open the question whether the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates Due Process. *See Moses v. Payne*, 555 F.3d 742, 753 (9th Cir. 2009) (concluding the constitutionality of such testimony is "an open question in [the Supreme Court's] jurisprudence.") (quoting *Carey*, 549 U.S. at 76). The Ninth Circuit held that, "[a]lthough '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (quoting *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009)). However, expert testimony that supports the victim's credibility may improperly invade the province of the jury and deny the defendant a fair trial. *See Cheney v. Washington*, 614 F.3d 987, 996 n.4 (9th Cir. 2010) ("Prosecutorial misconduct may occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from witnesses . . . ."). In Nevada, an expert may not testify to the veracity of another witness. *See Marvelle*, 966 P.2d at 157

1    (characterizing counselor's testimony that statements of a child-sexual-abuse victim were

2    "consistent" as vouching).

3          A habeas petitioner is entitled to relief on a claim of prosecutorial misconduct only

4    when the misconduct "so infected the trial with unfairness as to make the resulting

5    conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)

6    (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due

7    process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial,

8    not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "To

9    constitute a due process violation, the prosecutorial misconduct must be 'of sufficient

10   significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*,

11   483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) and

12   *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

13                    **c.      State Court's Determinations**

14         The NSC determined the trial court averted the nurse's "near-vouching" by

15   clarifying M.C.'s anal injuries neither established nor disproved consent:

16              During direct examination of the sexual assault nurse, the State
                asked if the nurse could tell whether M.C.'s anal injuries were consistent
17              with nonconsensual sex. The nurse responded that the injuries "were
                consistent with what [M.C.] was telling me." Bautista objected and the
18              district court interceded, questioning the nurse so as to establish that the
                anal injuries were consistent with either consensual or nonconsensual sex.
19              Outside the presence of the jury, Bautista argued that the nurse had
                impermissibly vouched for M.C.'s veracity. The district court overruled the
20              objection.

21              Vouching is not allowed because it invades the province of the jury.
                *Townsend v. State,* 103 Nev. 113, 119, 734 P.2d 705, 709 (1987). The
22              district court averted the sexual assault nurse's near-vouching by taking
                over the questioning to clarify that the anal lacerations she observed neither
23              established nor disproved consent. We therefore reject Bautista's argument
                that the sexual assault nurse impermissibly vouched for M.C.

24

25   (ECF No. 15-5 at 9, 19.)

26                    **d.      Analysis of Ground 2(D)**

27         The NSC was reasonable in its determination rejecting the claim that the nurse's

28   testimony vouched for M.C. as it cannot be said that the expert's comments "so infected

the trial with unfairness as to make the resulting conviction a denial of due process."
*Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. 637. First, the nurse repeatedly testified that it was not her job to determine whether M.C.'s sexual activity was consensual or not. Second, it is reasonable to conclude the trial court cured any defect that may have occurred by the nurse having volunteered that her findings were consistent with M.C.'s allegations when it elicited the nurse's agreement that she did not make a finding whether the injuries were the result of consensual or nonconsensual conduct and that the injury could have been caused by another man or circumstance. Third, defense counsel reinforced the trial court's clarification by arguing in closing that the State was unable to rely upon the nurse's findings to determine whether there was consent to the sexual activity. Finally, the prosecutor did not argue in closing argument that the nurse testified that M.C.'s injuries were consistent with M.C.'s story. Ground 2(D) is denied because the NSC's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the state court proceeding.

### 4.     Ground 2(E): Admission of Prior Act Evidence

Bautista alleges the trial court erred by allowing the State to elicit prior bad act evidence that he provided a false name and false identification to police when he was arrested and failed to give the jury a limiting instruction, all in violation of due process and the right to a fair trial under the Fifth and Fourteenth Amendments. (ECF No. 34 at 32.) Bautista alleges the erroneous ruling forced defense counsel to address his false identification during cross-examination of the detective and in Bautista's direct examination. (*Id.*) Respondents argue the NSC's determinations are objectively reasonable as the information was an admission by a party opponent and Bautista's testimony explaining that he had a fake identification for work purposes, and not for serious criminal activity, removed any prejudicial impact. (ECF No. 51 at 27-29.)

///

///

42

a.    **Additional Background**

Detective Richmond testified Bautista identified his name as "Jose," and never said his name is Eberto Bautista-Eredea. (ECF No. 12-1 at 188, 210.) Richmond testified that, after M.C. identified Bautista as her assailant, Richmond told Bautista he was under arrest for rape and kidnapping, read Bautista his constitutional rights, searched his person, and found a Mexican identification, whereupon Richmond stated, "this isn't Jose," and Bautista voluntarily stated, "that's my picture but that's not my name." (*Id.* at 189-90, 209-10.) Richmond testified that the name on the identification was "Miguel Angel Avonar." (*Id.* at 210.) At recess, Bautista made a record of his earlier objection to references to his giving a false name as an inadmissible prior bad act:

> [DEFENSE COUNSEL]: [I] made an objection at the bench to the State making references to my client giving a false name, the name of Jose, and my objection was that that's a prior bad act that should have been litigated pretrial.
>
> We didn't have the ability to have the State articulate in a *Petrocelli* hearing why it found it relevant, to what they felt was an [sic] exception to the bad acts rule, what the State intended to prove by that, and we think that it's prejudicial, and it should have been excluded.
>
> THE COURT: Do you want to make a response?
>
> First of all, the Court didn't note any trouble. I don't think that constitutes a bad act actually.
>
> I think that's just part of the story of the transaction factually according what had occurred between the crime that he is charged with committing, and the investigative process, and finding and locating the suspect and that investigative process.
>
> I don't think that actually, in my opinion, constitutes that which would be considered a bad act and would require a *Petrocelli* hearing.
>
> I think it's just part of the investigation process, and the statements made by the Defendant.
>
> So you have made your record and the objection for the record was overruled as to that question.

(*Id.* at 213-14.)

Bautista testified that when the police arrested him at the casino, he told them his name is "Miguel," not "Jose." (ECF No. 13-1 at 84, 92-93.) He admitted he provided the police with a Mexican driver's license that depicted his photograph bearing the name "Miguel Angel Avila," which is not his true name. (*Id.* at 84-85.) He admitted the detective

asked if it was a real ID and Bautista told him it was a real ID but the name on it was not

his name. (*Id.*) Bautista explained that he used the fake identification and corresponding

social security number to cash his employment checks:

> Q. Why were you carrying that ID?
> A. I work with the name of Miguel Angel Avila. I needed a picture ID with my photograph, with a name, in order for me to cash my checks.
> Q. Why do you work under that name?
> A. In concrete.
> Q. No. Why do you work under that other name?
> A. Because I work with Social Security number from that name.
> Q. And that is not your Social Security number?
> A. No, not the same.
> Q. You have that ID so that you can work?
> A. Exactly.
> Q. Are you a citizen of the United States?
> A. No.
> Q. Do you have any legal right to be in the United States?
> A. No.
> Q. But you needed to work to live?
> A. Exactly.
> Q. Is that why you got that ID that wasn't your name?
> A. Exactly.

(*Id.* at 85-86.)

### b.    Standards Governing Prior Act Evidence

"The admission of evidence does not provide a basis for habeas relief unless it

rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63

F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991)).

Admission of evidence violates federal due process "only if there are no permissible

inferences the jury may draw from the evidence" and the evidence is "of such quality as

necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.

1991) (citation omitted); *see also Lisenba v. People of State of California*, 314 U.S. 219,

236 (1941). Where an alleged due process violation stems from an evidentiary challenge,

federal courts consider whether the admission of the evidence "so infected the entire trial that the resulting conviction violates due process." *See Estelle*, 502 U.S. at 72.

However, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (acknowledging the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus (citing 28 U.S.C. § 2254(d))); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly").

The Supreme Court has thus far declined to hold that evidence of other crimes or bad acts violates due process. *See Estelle*, 502 U.S. at 75 n.5 (explaining that it "express[es] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *accord Mejia v. Garcia*, 534 F.3d 1036, 1047 (9th Cir. 2008) ("[T]he United States Supreme Court has never established the principle that introduction of evidence of uncharged offenses necessarily must offend due process."); *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (stating "[t]he Supreme Court has expressly reserved the question of whether using evidence of the defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process" and holding that "[b]ecause the [Supreme] Court has 'expressly left this issue an "open question,"' the state court did not unreasonably apply clearly established federal law in determining that the admission of evidence of Larson's criminal history did not violate due process"); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006) (concluding, on deferential review under AEDPA, that state supreme court did not act in objectively unreasonable manner in determining the use of propensity evidence did not violate due process because the Supreme Court expressly left open the question whether use of propensity evidence may violate due

1  process). "[W]hen the Supreme Court has expressly reserved consideration of an issue,

2  as it has here, the petitioner cannot rely on circuit authority to demonstrate that the right

3  he or she seeks to vindicate is clearly established." *Alberni*, 458 F.3d at 864. "Circuit

4  precedent is relevant only to the extent it clarifies what constitutes clearly established

5  law." *Id.*

6  ### c.    State Court's Determinations

7  On direct appeal, the NSC held the evidence that Bautista provided a false name

8  to the police was a party admission and the evidence of his false identification did not

9  render the trial fundamentally unfair:

> Acting on M.C.'s call, the police went to the Virgin River Casino and found Bautista, who gave them a false name, "Jose." They detained him while a detective drove M.C. to the casino. When M.C. arrived, she identified Bautista as her assailant. Asked if he recognized M.C., Bautista said he had given her a ride several months earlier.
>
> [FN 1] Bautista does not challenge his detention or pre-*Miranda* questioning.
>
> Bautista was arrested, charged with kidnapping and two counts of sexual assault, and read his rights. Bautista was carrying false identification bearing his picture but the name Miguel Angel Avenivar. (Bautista denies first telling the detectives his name was Jose; he says he told them it was Miguel. His real first name is Eberto.)
>
> . . . .
>
> The arresting officer testified on direct examination to Bautista initially saying his name was "Jose." Defense counsel objected to this as prior bad act evidence, inadmissible because it was not vetted pretrial in a *Petrocelli* hearing. The court overruled the objection. Later, without objection, evidence was introduced as to the false identification card found on Bautista in the name "Miguel Angel Avenivar."
>
> . . . .
>
> Bautista contends that the State should have requested, and the district court should have held, a *Petrocelli* hearing before allowing testimony about Bautista falsely identifying himself as "Jose." *See Petrocelli v. State,* 101 Nev. 46, 692 P.2d 503 (1985), *superseded in part by statute on other grounds as recognized in Thomas v. State,* 120 Nev. 37, 45, 83 P.3d 818, 823 (2004). Although Bautista made a *Petrocelli* objection to this testimony, which was overruled, he did not object to the later introduction of evidence concerning the false identification he carried. The false-name testimony did not require a *Petrocelli* hearing; it evidenced evasiveness consistent with consciousness of guilt and was a party admission. The false-identification evidence arguably constituted a separate offense under NRS 205.465(1) that, had objection been interposed, could have required a *Petrocelli* hearing. However, the error, if any, is not plain. The potential prejudice arising from Bautista's possessing false identification is minimal

1  compared to the seriousness of the crimes charged in this case. Bautista
2  testified on direct examination that he possessed the false identification
   because he was an illegal immigrant and needed the identification to work,
   not for more nefarious purposes.

3        Nor do we credit Bautista's argument that the lack of a *Petrocelli*
   hearing violated his due process rights. Admission of prior bad acts does
4  not violate due process unless it results in an actual miscarriage of justice.
   *Alberni v. McDaniel,* 458 F.3d 860, 863-64 (9th Cir. 2006); *see also Walters*
5  *v. Maass,* 45 F.3d 1355, 1357 (9th Cir. 1995) (a federal court "cannot disturb
   on due process grounds a state court's decision to admit prior bad acts
6  evidence unless the admission of the evidence was arbitrary or so
   prejudicial that it rendered the trial fundamentally unfair").

7

8  (ECF No. 15-5 at 4-5, 9-10, 19-20.)

9            **d.      Analysis of Ground 2(E)**

10      The NSC's determinations are neither contrary to nor constitute unreasonable

11  applications of clearly established federal law as determined by the Supreme Court and

12  are not based on an unreasonable determination of the facts considering the evidence

13  presented during the state court proceedings. Absent clear Supreme Court authority on

14  point, even the erroneous admission of evidence resulting in a fundamentally unfair trial

15  may not allow the grant of habeas relief. *See Holley*, 568 F.3d at 1101. To the extent the

16  Supreme Court has addressed the issue, it has expressly reserved consideration of

17  whether the admission of prior bad acts under state law to show propensity constitutes a

18  due process violation. *See Alberni*, 458 F.3d at 864 (citing *Estelle*, 502 U.S. at 75 n.5

19  (1991)). Accordingly, the NSC's determination cannot be contrary to nor constitute an

20  unreasonable application of clearly established federal law as determined by the

21  Supreme Court. *See Carey*, 549 U.S. at 77; *Holley*, 568 F.3d at 1101. Assuming arguendo

22  this Court may consider the NSC's determination that the admission of the evidence did

23  not violate due process, the Court finds the NSC reasonably determined the admission

24  of the evidence did not so infect the proceedings as to render his trial fundamentally

25  unfair. The evidence of Bautista's prior lie about his name is a party admission and that,

26  together with his use of a fake identification, was relevant to permissible inferences that

27  could be drawn concerning his veracity. *See Jammal*, 926 F.2d at 920 ("Only if there are

28  *no* permissible inferences the jury may draw from the evidence can its admission violate

due process.").

For the foregoing reasons, Ground 2(E) is denied. However, the Court will issue a Certificate of Appealability for Ground 2(E), insofar as the admission of the evidence concerning the fake identification, as reasonable jurists could conclude the Court's assessment of the constitutional claim is debatable or wrong. *Slack*, 529 U.S. at 483-84.

### 4. Ground 2(F)—References to M.C. as a "Victim"

Bautista alleges that repeated references to M.C. as a "victim" on the part of the prosecutor, Detective Richmond, and the jury instructions, so infected the trial with unfairness that it violated his rights to due process and a fair trial under the Fifth and Fourteenth Amendments. (ECF No. 34 at 33-35.) He claims such repeated references lowered the burden of proof by implying that a crime was committed against M.C. despite Bautista's claim that she was not a victim of a crime. (*Id.*)

### a. Additional Background

During jury selection, the prosecutor stated that "we allege that on October 8, 2008, into October 11, 2009, the Defendant kidnapped and sexually assaulted twice our victim, [M.C.]." (ECF No. 11-1 at 53.) The prosecutor elicited M.C.'s testimony that she "made a claim that" she "had been the victim of a crime." (ECF No. 12-1 at 74.) When later questioning MPD officer James Macias, the prosecutor referred to M.C. as "the alleged victim" before asking Macias "did you take any handwritten notes while you were talking to the victim?" (*Id.* at 84, 86.) The prosecutor and Detective Richmond referred to M.C. as "the victim" during Richmond's examination:

Q. How did you become involved in that investigation?

A. Approximately 10 a.m., on Friday the 13th, I received a phone call from Mesquite Dispatch stating that the victim, [M.C.], had called and stated that she had ran into, at least ran into the Defendant at the Maverick Store in Mesquite, Nevada.

. . . .

Q. [W]e are going to play [the Maverick video surveillance tape] again.

(Whereupon, the video tape continued to be played for the jury at this time[)].

A. That's the victim.

[BY THE STATE]:

Q. Thank you. Officer, you just—we will pause it now.

    Officer, you just identified someone as the victim. Can you point her out to us?

A. [M.C.]

Q. Okay. Can you circle her already?

. . . .

Q. Sir, you have just witnessed approximately 45 seconds of the video. Can you describe for the record what just occurred on this video?

A. Conversation between the Defendant and the victim, and at this point, the victim goes back to her residence.

. . . .

Q. And would you agree that what you saw was the Defendant leaving and the victim leaving, correct?

A. Correct.

Q. And the victim then goes over to her scooter, which you see on the screen, correct?

A. Yes.

Q. You can see the victim with her back to the Defendant, correct?

A. Correct.

Q. Can you see the victim's mouth moving?

A. I can't from there.

. . . .

Q. Did you see the victim place a—her soda cup in the basket of her scooter?

A. I did.

. . . .

Q. At any point, did you see the victim, [M.C.], turn towards the Defendant?

A. Briefly—well, no.

. . . .

Q. And that concludes this video.

    Did you see the victim take off on her scooter?

A.    Yes.

. . . .

Q. Is that 20 feet, is that about right?

A. Actually, I would say [Sally Lantow] was a little bit closer because the fountain area to where the entrance to the deli is is probably no wider than that, Sally Lantow away [sic] from the Defendant and the victim, probably, I, I don't know, I would say maybe 12 feet.

49

(*Id.* at 181, 194, 201-02, 205.)

The jury was instructed that the State had the burden to prove the charges beyond a reasonable doubt. (ECF No. 14-1 at 14-15.) The jury was instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case," that the jurors "must not speculate to be true any insinuations suggested by a question asked a witness," as "[a] question is not evidence and may be considered only as it supplies meaning to the answer," and "[w]hatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions . . . ." (*Id.* at 16, 24.) Instruction 3, which stated the allegations from the Indictment, referred to M.C. by name, and that instruction did not refer to her as "the victim." (*Id.* at 6-8, 11.) Instructions 5, 6, 7, and 8 referred to "the victim" in describing the requirements for a conviction and Instruction 22 referred to "the alleged victim." (*Id.* at 6, 7, 8, 11, 23.)

In closing argument, the prosecutor used the term "victim," stating that "the law specifically says that a victim of sexual assault is not required to do more than she physically can . . . ." (ECF No. 13-1 at 147.) In closing argument, defense counsel referred to M.C. as the victim: "no evidence was seized at the victim's home. No clothing was taken at the victim's home." (*Id.* at 170.) In rebuttal, the State read Instruction 22, which referred to "the alleged victim." (*Id.* at 173.)

### b.   Applicable Legal Principles

To obtain federal habeas relief based on an improper jury instruction, petitioner must establish that the instruction so impacted the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72. The question is whether the instructional "error, in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998). "'[A] single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.'" *Boyde v. California*, 494 U.S. 370, 378 (1990). Federal habeas relief is justified when a prosecutor's comments have "so

infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. 637)).

### c.     State Court's Determination

The NSC determined Bautista failed to object to references to "the victim," and the references were not plain error as it upheld instructions that used that term, although without specifically addressing whether the term was appropriate:

> Without objection from Bautista, the State and one of its witnesses, the arresting detective, repeatedly referred to M.C. as "the victim." Jury instructions 5, 6, 7, and 10 also referred to "the victim" or "a victim." In addition, jury instruction 10 stated that a victim's testimony, even if uncorroborated, can sustain a guilty verdict. Finally, jury instruction 13 stated: "The defendant is presumed innocent *until* the contrary is proved." (Emphasis added.) Bautista made no objection to any of these instructions except jury instruction 10, and only to the language regarding corroboration. The district court overruled the objection.
>
> Bautista complains that the references to M.C. as "the victim" improperly injected the prosecutor's personal beliefs into the case and that the district court compounded the error by giving jury instructions that referred to M.C. as "the victim." Bautista made no objection to either at trial.
>
> This precise issue has not been addressed by this court. Other courts disagree on this issue. *See, e.g., Carie v. State,* 761 N.E.2d 385, 385 (Ind. 2002) (Dickson, J., dissenting) (referring to an accuser as "the victim," at least in jury instructions, "invades the province of the jury" and constitutes error); *State v. Nomura,* 903 P.2d 718, 722-23 (Haw. App. 1995) (finding the jury instructions "inaccurate and misleading" but ultimately determining that the error was harmless). However, this court has upheld jury instructions which use "the victim" language without specifically addressing the issue of whether the term "victim" is appropriate. *Gaxiola,* 121 Nev. at 647-48, 119 P.3d 1231-32; *see also Flanagan v. State,* 112 Nev. 1409, 1423, 930 P.2d 691, 700 (1996) ("Failure to object or to request an instruction precludes appellate review, unless the error is patently prejudicial and requires the court to act sua sponte to protect a defendant's right to a fair trial.").
>
> Because Bautista failed to object, plain error review applies. Given *Gaxiola,* 121 Nev. at 647-48, 119 P.3d 1231-32, plain error does not appear.

(ECF No. 15-5 at 20-21.)

### d.     Analysis of Ground 2(E)

The NSC's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on unreasonable determinations of fact considering the evidence presented in the state-court proceeding.

None of the instructions refer to M.C. specifically as a victim. As the NSC pointed out, the jury was instructed that "[t]he defendant is presumed innocent until the contrary is proved." (ECF No. 14-1 at 14.) Moreover, the jury was instructed that "[t]his presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense." (*Id.*) Considering the context of the jury instructions as a whole, it was not unreasonable to conclude that the references to "the victim" in the jury instructions did not convey that M.C. was in fact the victim in a way that lowered the standard of proof or so infected the trial with unfairness as to make the resulting conviction a denial of due process.[8] *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Bautista alleges the NSC's determination was unreasonable as it relied on inapposite precedent in *Gaxiola*. However, "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68.

Bautista alleges the NSC failed to acknowledge his claim that references to M.C. as "the victim" impermissibly bolstered M.C.'s credibility, and its conclusion is based on an unreasonable determination of the facts and is contrary to *Darden*, 477 U.S. 168; *Cupp*, 414 U.S. 141; and *Estelle*, 502 U.S. 62. (ECF No. 68 at 77-81.) Bautista fails to rebut the presumption that the NSC addressed the misconduct claims. *See Johnson*, 568 U.S. at 301-02. In his opening brief for his state court direct appeal, Bautista alleged the prosecutor's reference to M.C. as "the victim" violated due process by espousing the prosecutor's opinion that Bautista was guilty, and that the testimony of the investigating officials referring to M.C. as "the victim" improperly vouched for her credibility. (ECF No. 14-20 at 34-37.) In his reply in support of his appeal, Bautista did not respond to the State's arguments concerning this issue. (ECF No. 15-3.) The NSC acknowledged that Bautista claimed the prosecutor's references to M.C. as the "the victim" injected the

---

[8]The courts in this district previously rejected this argument and the Court agrees with those decisions. *See Romano v. Baker*, No. 3:14-cv-00187-MMD-WGC, 2018 WL 4643127, at *15 (D. Nev. Sept. 27, 2018); *Aviles-Perez v. LeGrand*, No. 3:13-cv-00173-RCJ, 2015 WL 5056897, at *20 (D. Nev. Aug. 25, 2015).

1    personal beliefs into the case. (ECF No. 15-5 at 20-21.) The NSC also cited a dissenting

2    opinion from an Indiana case, which states that "[i]n criminal cases, particularly those in

3    which the defendant disputes the nature or cause of harm inflicted, or challenges whether

4    an alleged crime occurred, it is reasonable for a prosecutor to refer to the person harmed

5    as the 'victim,' notwithstanding the defense counsel's preference for a different

6    designation." (*Id.*) (citing *Carie v. State*, 761 N.E.2d 385 (Ind. 2002) (Dickson, J.,

7    dissenting)). And, in its decision, the Nevada Supreme court noted that "[w]e have

8    considered and rejected Bautista's remaining assignments of error." (ECF No. 15-5 at

9    23.) Bautista thus fails to rebut the presumption that the NSC adjudicated the merits of

10   the prosecutorial misconduct and burden-shifting portions of this claim.

11          Objectively reasonable jurists would agree the NSC could reasonably determine

12   the prosecutor and the law enforcement witnesses' references to M.C. as "the victim," did

13   not so infect the trial with unfairness as to make the resulting conviction a denial of due

14   process." *See Darden*, 477 U.S. at 181; *Donnelly*, 416 U.S. 637. The jury was instructed

15   that counsel's remarks are not evidence, and the jury "must not speculate to be true any

16   insinuations suggested by a question asked a witness." *See supra* at 49. Moreover, the

17   jury was instructed that it must decide the case solely on the evidence, and that Bautista

18   was presumed innocent until proven guilty beyond a reasonable doubt. *See supra* at 49.

19   In all instances, there is no indication that the use of the term in identifying M.C. was part

20   of an ongoing pattern or misstated or manipulated the evidence. *See supra* at 47-49.

21   Even defense counsel referred to M.C. as "the victim" in closing remarks. *Id.* Finally, the

22   jury's acquittal on the sexual assault charge in connection with M.C.'s allegation that

23   Bautista sodomized her at a restaurant demonstrates the jury was not misled or

24   persuaded to believe that mere references to M.C. as the victim relieved the State of its

25   burden to prove that M.C. was in fact a victim beyond a reasonable doubt. (ECF No. 14-

26   3.) Based on the *Darden* factors, the testimony of M.C. and Bautista, along with the

27   instructions to the jury, the NSC could reasonably determine that the references to M.C.

28   as the "victim" by the prosecutor and the witnesses did not render Bautista's trial

1    fundamentally unfair in violation of due process. Accordingly, Ground 2(E) is denied.

2        **C.    Ground 3: IAC Claims**

3        Bautista alleges he received ineffective assistance of trial counsel ("IAC") in

4    violation of the Sixth and Fourteenth Amendments. (ECF No. 34 at 35.)

5            **1.    Standards for Evaluating IAC**

6        "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it

7    promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

8    An IAC claim requires a petitioner to demonstrate that the attorney's "representation fell

9    below an objective standard of reasonableness" and that the attorney's deficient

10    performance prejudiced the petitioner such that "there is a reasonable probability that, but

11    for counsel's unprofessional errors, the result of the proceeding would have been

12    different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "A reasonable

13    probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The

14    likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562

15    U.S. at 112; *Cullen*, 563 U.S. at 189. A petitioner must show "counsel made errors so

16    serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

17    the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant

18    of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88. "Unless a

19    defendant makes both showings, it cannot be said that the conviction . . . resulted from a

20    breakdown in the adversary process that renders the result unreliable." *Id.*

21        A petitioner "must identify the acts or omissions of counsel that are alleged not to

22    have been the result of reasonable professional judgment." *Id.* at 690. A court "must

23    indulge a strong presumption that counsel's conduct falls within the wide range of

24    reasonable professional assistance, that is, the defendant must overcome the

25    presumption that, under the circumstances, the challenged action 'might be considered

26    sound trial strategy.'" *Id.* at 689. A court is obliged to "determine whether, in light of all the

27    circumstances, the identified acts or omissions were outside the wide range of

28    professionally competent assistance." *Id.* at 690. "In making that determination, the court

should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work," but that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate counsel's conduct from counsel's perspective at the time." *Id.* at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. IAC claims are examined separately to determine whether counsel was deficient, but "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland's* deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'" (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003))).

## 2. Ground 3(A): Failure to Object to Cross-Examination and Comment on Bautista's Post-arrest Silence and Attorney-client Communication

Bautista alleges trial counsel provided ineffective assistance by stipulating the State could question and comment on Bautista's post-*Miranda* silence, failing to object to cross-examination that exceeded the scope of testimony the State sought to rebut, and

failing to object to questions that invaded his attorney-client privilege. (ECF No. 34 at 36-37.) The factual background underlying this claim is discussed in Ground 2(B). *See supra* at 25-29.

The NSC determined Bautista did not demonstrate counsels' decision to allow comment on post-*Miranda* silence or failure to object to testimony about Bautista's exchanges with his counsel was deficient or prejudicial under *Strickland*:

> Appellant argues that the district court erred in denying his claims of ineffective assistance of counsel without an evidentiary hearing. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, U.S. at 694. Both components of the inquiry must be shown, *id.,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). When a postconviction petition raises claims supported by specific factual allegations which, if true, would entitle the petitioner to relief, the petitioner is entitled to an evidentiary hearing unless those claims are repelled by the record. *Hargrove v. State*, 100 Nev. 498, 503, 686 P.2d 222, 225 (1984).

> [A]ppellant argues trial counsel was ineffective for agreeing that the State could comment on appellant's post-arrest silence and should have objected to questions that violated attorney-client privilege. Appellant has not demonstrated deficient performance or prejudice. Trial counsel's decision to allow the State to comment on the post-arrest silence, discussed briefly on the record, was strategic, and appellant has not shown extraordinary circumstances warranting a challenge to that decision. *See Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (recognizing that strategic decisions will be virtually unchallengeable absent extraordinary circumstances); *see also Strickland*, 466 U.S. at 689 (recognizing that review of counsel's performance is "highly deferential" and that "[t]here are countless ways to provide effective assistance in any given case"). Appellant has not demonstrated a reasonable probability of a different outcome without the comments on post-arrest silence in light of the substantial evidence of guilt, including the victim's testimony. Further, as this court determined that the State's question about exchanges between appellant and his counsel did not amount to plain error or result in substantial prejudice, appellant has likewise not demonstrated a reasonable probability of a different outcome had counsel objected to the State's question.

> [FN 7] This court observed that appellant's "response about his exchanges with his attorneys was ambiguous, arguably not solicited by the question he was asked, and quite brief." *Bautista-Eredea*, Docket No. 55178, Order at 18. We further conclude that appellant has not demonstrated that the

> State's question amounted to burden-shifting, and thus, he has not demonstrated his counsel was ineffective in this regard.
>
> Therefore, we conclude that the district court did not err in denying this claim without an evidentiary hearing.

(ECF No. 18-7 at 4-5, 8-9.)

It was objectively reasonable for the NSC to determine counsel was not deficient under *Strickland* in making a strategic decision to elicit evidence of Bautista's post-*Miranda* silence, and to agree that, because of that strategy, the State was permitted to address Bautista's post-arrest silence in cross-examination and closing remarks. An objectively reasonable trial attorney could choose to present evidence that the police failed to ask Bautista for his side of the story when they arrested him in the hope that it would improve Bautista's credibility by showing Bautista fully cooperated with the police, did not act like he had anything to hide, and, although Bautista was willing to talk with the police, the police took for granted M.C.'s credibility without ever asking Bautista for his side of the story. The fact that the strategy opened the door to the State's closing argument that Bautista's silence allowed him to tailor his testimony to the evidence did not necessarily mean the strategy was unreasonable, particularly in a case like this where the outcome boiled down to a credibility contest and the jury would be instructed they needed no corroboration of M.C.'s story to convict Bautista if they believed M.C. The fact that the strategy may have been undermined by the State's argument shows at most that the defense strategy might not have worked out as well as counsel had hoped. *See Harrington*, 562 U.S. at 109. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight . . . ." *Id.* at 110. Bautista alleges trial counsel labored under a misapprehension of law. (ECF No. 68 at 87). This argument is belied by trial counsel's failure to object on that basis during the State's examination and argument.

The NSC was also reasonable in its determination that trial counsel did not perform deficiently in failing to object when the State appeared to exceed the bounds of fair comment, including its question asking about Bautista's conversations with his attorneys

and its unfair questions about Bautista not speaking up at grand jury and arraignment proceedings to give an account of what truly occurred. An objectively reasonable attorney, who endeavored to show Bautista was credible and had nothing to hide, could determine that an objection that the State exceeded the scope of the agreement in its cross-examination and closing argument could be perceived by the jury as undermining that defense strategy that Bautista was forthcoming and credible about his version of the events.

Finally, the NSC was reasonable in its determination that counsel was not deficient for failure to object to the State's question whether Bautista spoke with his counsel about talking to the police. Under the circumstances, even if Bautista's ambiguous response revealed an attorney-client communication, an objectively reasonable attorney could choose, based on the defense strategy to portray Bautista as forthcoming, not to object. Moreover, given the acquittal for one of the sexual assault counts, there is no reasonable probability the result of the proceedings would have been different but for counsel's failure to object.

The NSC's determination that trial counsel was not ineffective under *Strickland* is objectively reasonable and Ground 3(A) is denied.

### 3.    Ground 3(B): Objection to References to M.C. as "Victim"

Bautista alleges trial counsel were ineffective in failing to object to the State's comments, and jury instructions 5-7, 10, and 22, on the grounds they refer to M.C. as "the victim" and lessened the State's burden of proof. (ECF No. 34 at 40.) This Court determined this claim is unexhausted and deferred ruling whether Bautista can overcome the default until review of the merits of the Petition. (ECF No. 68 at 90.)

The factual background underlying this claim is set forth in Ground 2(F). *See supra* at 47-49. Bautista raised the ineffective assistance of trial counsel claim presented in Ground 3(B) in the state district court in his amended state habeas petition. (ECF No. 15-21 at 22.) Bautista's state habeas counsel recognized this fact in his supplement to the

petition. (ECF No. 16-21 at 7.) Bautista's briefing to the NSC omitted this claim. (ECF No. 18-1.)

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022). "When a [petitioner] has failed to do so, and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.' *Id.* "To overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

For claims of ineffective assistance of trial counsel, a federal habeas court may find "cause" to excuse a procedural default, where (1) the claim of ineffective assistance of trial counsel is "substantial"; (2) "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012) and citing *Coleman*, 501 U.S. 722).[9] The requirements of cause and prejudice are distinct but "[t]he analysis of whether both cause and prejudice are established under *Martinez* will necessarily overlap," as "each considers the strength and validity of the underlying ineffective assistance claim.'" *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019).

"To establish 'prejudice' under *Martinez*, the underlying trial counsel IAC claim must also be 'a substantial one, which is to say . . . that the claim has some merit.'"

---

[9]Nevada law requires prisoners to raise ineffective assistance of counsel claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for purposes of applying the *Martinez* rule. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

*Michaels v. Davis*, 51 F.4th 904, 931 (9th Cir. 2022) (quoting *Martinez*, 566 U.S. at 14). "The Supreme Court has said little about the meaning of 'substantial,' but has cited as analogous the standard for granting a certificate of appealability under 28 U.S.C. § 2253." *Id.* (citing *Martinez*, 566 U.S. at 14). "For a certificate of appealability to issue, a habeas petitioner must show 'that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement.'" *Id.* (quoting *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017)). "Under that standard, [a] court should conduct a general assessment of the[ ] merits, but should not decline to issue a certificate merely because it believes the applicant will not demonstrate an entitlement to relief." *Id.* (citing *Cook v. Ryan*, 688 F.3d 598, 610 n.13 (9th Cir. 2012) (alteration in original) (quoting *Miller-El*, 537 U.S. at 336-37) (internal quotation marks omitted). "When considering whether trial counsel was ineffective" for a *Martinez* analysis, a federal habeas court uses "the *Strickland* standard," but does "not apply it as strictly" as if it were considering the merits of the *Strickland* claim. *Id.*

Bautista fails to establish a substantial claim that trial counsel's performance was deficient under *Strickland*. As the NSC acknowledged, it previously upheld jury instructions that used "the victim" language and it had never addressed the issue whether the term "victim" is appropriate in instructions. *See supra* at 50 (citing *Gaxiola,* 119 P.3d 1231-32). Thus, a reasonable trial attorney could conclude that objection to the instructions was futile. Accordingly, objectively reasonable jurists would agree that Bautista fails to establish a substantial claim that trial counsel's failure to object to the use of the term "the victim" in the jury instructions fell below an objectively standard of reasonableness under *Strickland*.

Bautista also fails to establish a substantial claim that trial counsel was ineffective in failing to object to the use of the term "victim" by the prosecutor and the witnesses. Objectively reasonable jurists would agree Bautista has not demonstrated a reasonable probability that, but for counsels' failure to object, the result of the trial would have been different. The jury's acquittal on the sexual assault charge in connection with M.C.'s

allegation that Bautista sodomized her at a restaurant demonstrates the jury was not misled or persuaded to believe that mere references to M.C. as the victim relieved the State of its burden to prove that M.C. was in fact a victim beyond a reasonable doubt. *See supra* at 47-53.

Because Bautista fails to establish a substantial IAC claim for his allegations in Ground 3(B), he has not overcome the default. Ground 3(B) is therefore dismissed.

### 4.   Ground 3(C): Failure to Investigate and Utilize MPD Reports

Bautista alleges trial counsel was ineffective in failing to investigate, obtain, and utilize MPD reports relating to M.C. dated before trial (June 8, 2009, and May 21, 2009) and after the trial (December 23, 2009, April 6, 2013, July 13, 2013, and July 16, 2013). (ECF No. 34. at 41-42.) A summary of the information contained in the alleged MPD reports is set forth in the discussion of Ground 1. *See supra* at 7-9.

The NSC determined Bautista failed to demonstrate trial counsel's performance was deficient or prejudicial:

> Appellant argues trial counsel did not adequately investigate, obtain, and use police reports relating to the victim dated before trial (June 8, 2009, and May 21, 2009) and after the trial (December 23, 2009, April 6, 2013, July 13, 2013, and July 16, 2013). Appellant argues that these reports bear directly on the victim's credibility and demonstrate that she falsely claimed to be the victim of a sexual assault or attempted sexual assault on multiple occasions. Appellant fails to demonstrate deficient performance or prejudice. Trial counsel cannot be deficient for not finding or using police reports that were generated about events occurring after trial.
>
> > [FN 4] To the extent appellant argues that trial counsel should have obtained these reports for the retrial, trial counsel cannot be ineffective for not obtaining evidence for a trial that never took place. And trial counsel is not ineffective for failing to obtain evidence for a postconviction motion for new trial because there is no statutory or constitutional right to the appointment of counsel to pursue a motion under NRS 176.515(2). *See generally Brown v. McDaniel*, 130 Nev. 565, 569, 331 P.3d 867, 870 (2014) (recognizing there can be no deprivation of the right to the effective assistance of counsel where there is no right to counsel).
>
> *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Appellant concedes trial counsel obtained the police reports predating the trial, and in fact, trial counsel cross-examined the victim about whether she lied to the police about the incident memorialized in the May

21, 2009, police report.

> [FN 5] The district court granted the State's motion in limine regarding the statement of prostitution in the May 21, 2009, police report. On appeal, this court determined that this was not error. *Bautista-Eredea v. State,* Docket No. 55178, Order at 10-13.

Appellant has not demonstrated prejudice based on counsel's failure to use the June 8, 2009, police report because any relevance related to the vacated kidnapping count, and he does not show a reasonable probability that use of the June 2009 incident would have changed the outcome as to his conviction for sexual assault.

> [FN 6] The June 8, 2009, police report does not contain even an inference of a false allegation of sexual assault. Rather, it is a lost property report involving the victim getting into a vehicle with strangers.

> Therefore, the district court did not err in denying this claim without an evidentiary hearing.

(ECF No. 18-7 at 5-6.)

The NSC's determination that Bautista had no constitutional right to counsel for the purpose of filing a new trial motion based on M.C.'s false claims of rape contained in the December 2009 MPD report is objectively reasonable. *See Rose v. Hedgpeth*, 735 F. App'x 266, 269 (9th Cir. 2018) ("The U.S. Supreme Court has never held that a post-trial, pre-appeal motion for a new trial is a "critical stage" to which the Sixth Amendment right to counsel applies."). *See also Marshall v. Rodgers*, 569 U.S. 58, 61 (2013) (assuming, "without so holding" a motion for new trial is a critical stage of the prosecution for the appointment of counsel).

Assuming that the NSC was unreasonable in its determination that Bautista was not constitutionally entitled to counsel for the purpose of filing a new trial motion, this Court would find, on *de novo* review, that Bautista has not established trial counsel acted unreasonably in failing to continue to investigate M.C.'s complaints to MPD after trial concluded in September of 2009. The record contains nothing that put trial counsel on notice that reports were made posttrial. Thus, trial counsel's failure to uncover the information contained in the December 2009 report and file a motion for new trial based on the information contained in it, did not fall below an objective standard of reasonableness under the circumstances. *See Strickland*, 466 U.S. at 690-91 ("Strategic

1    choices made after less than complete investigation are reasonable precisely to the

2    extent that reasonable professional judgments support the limitations on investigation.").

3         The NSC was also reasonable in its determination that trial counsel did not perform

4    deficiently in failing to investigate and utilize the 2013 MPD reports for a motion for new

5    trial. Under NRS § 176.515(3), "[e]xcept as otherwise provided in NRS 176.09187, a

6    motion for a new trial based on the ground of newly discovered evidence may be made

7    only *within 2 years after the verdict or finding of guilt*." NRS § 176.515(3) (emphasis

8    added).[10] Again, even if Bautista had a right to counsel for the purpose of filing a motion

9    for new trial, a reasonable trial attorney would not have moved for a new trial based on

10   those 2013 reports. The incidents documented in those reports did not occur until after

11   the two-year deadline in 2011 for filing a motion for new trial. Bautista's allegation that

12   trial counsel should have investigated and pursued a retrial for the sexual assault

13   conviction after the NSC reversed the kidnaping conviction, is misguided. (ECF No. 34 at

14   53.) The NSC did not reverse and remand for a retrial of the sexual assault conviction—

15   it only reversed and remanded for a new trial on the kidnapping conviction. (ECF No. 15-

16   5 at 2.) Moreover, the State chose not to pursue a new trial. Bautista fails to establish trial

17   counsels' failure to investigate and pursue a retrial on the sexual assault charge based

18   on the 2013 police reports was deficient under *Strickland*.

19        The NSC reasonably concluded trial counsel was not deficient in failing to question

20   M.C. about her having accepted a ride from men she had just met on June 8, 2009. A

21   reasonable attorney could conclude the information in the report was irrelevant and

22   unhelpful as the report concerned no false statements or sexual assault and was not

23   probative of whether M.C. consented to enter Bautista's truck or engage in sodomy

24   with Bautista.

25

26        [10]The Court notes that during an earlier time not relevant here, NRS § 176.515(3)
     required a new trial motion be filed within two years of *the termination of the final
27   judgment*. *See Ybarra v. State*, 628 P.2d 297, 297 (1981) (emphasis added) (holding that
     for purposes of § 176.515(3), which at that time provided in pertinent part that "[a] motion
28   for a new trial based on the ground of newly discovered evidence may be made only
     before or within 2 years after final judgment," the phrase "final judgment" was the
     termination of the appellate process).

Turning to the report of May 21, 2009, the NSC was reasonable in its determination that trial counsel was not deficient in stipulating to exclude cross-examination concerning M.C.'s prostitution. The state court rulings demonstrate objection was futile. The May 2009 incident did not involve a false claim of sexual assault. And the defense chose not to pursue a theory that M.C. consented to the sexual activity under a prostitution agreement. As the state court rulings demonstrate, evidence of prostitution was not protected from admission under the state rape shield statutes but was more prejudicial than probative.

For the foregoing reasons, Ground 3(C) is denied. The Court will, however, issue a Certificate of Appealability for Ground 3(C) as reasonable jurists could conclude the Court's assessment of the constitutional claim whether trial counsel was ineffective in failing to cross-examine M.C. about the facts underlying the May 21, 2009 MPD report, is debatable or wrong. *Slack*, 529 U.S. at 483-84.

### 5.   Ground 3(D): Concession to Inadmissibility of Prostitution

Bautista alleges trial counsel were ineffective as there is no reasonable strategic or tactical decision that justifies counsel's concession that M.C.'s admission to acts of prostitution in May of 2009 were inadmissible or counsel's failure to use that evidence to impeach M.C.'s credibility. (ECF No. 34 at 42, 46.) He alleges trial counsel was ineffective in failing to use the information to argue that M.C. invented the charge of rape after Bautista refused to pay her and lied about being the victim of a sex crime. (*Id.* at 45.) Respondents argue the evidence of prostitution was irrelevant and inadmissible under state law and counsel made a reasonable strategic decision to present a defense based on consent, not based on a theory the allegations of sexual assault were in response to a failure to pay for prostitution. (ECF No. 51 at 36-40.)

The general factual background for this claim is discussed in Ground 2(A). *See supra* at 15-17. In addition, in Bautista's response to the State's *in limine* motion to preclude evidence that M.C. engaged in prostitution as set forth in the May 2009 MPD report, the defense indicated they were aware that Bautista could present a defense

based on a theory that M.C. consented because she and Bautista agreed to an act of prostitution. (ECF No. 10-7.) Before jury selection, defense counsel indicated the defense was that the sex was consensual, but "maybe or maybe not for money." (ECF No. 11-1 at 7-8.) Defense counsel argued the main concern regarding admissibility of the May 2009 MPD report concerned M.C.'s dishonesty with the police, not her prostitution. (*Id.* at 8, 13.) At trial, Bautista presented no evidence that his sexual encounter with M.C. involved prostitution.

The NSC determined trial counsel's concession to the inadmissibility of acts of prostitution was neither deficient nor prejudicial under *Strickland* as the evidence that M.C. prostituted herself, as set forth in the May 2009 report, was inadmissible to support an inference that she consented to the sexual encounter with Bautista and no evidence supported a theory that M.C. accused Bautista of sexual assault as revenge for nonpayment:

> [A]ppellant argues that trial counsel should not have conceded that acts of prostitution were inadmissible. Appellant asserts that acts of prostitution were relevant to show untruthfulness and "knowledge and absence of mistake regarding [the victim's] participation in sexual activity." Appellant further asserts that trial counsel could have used this evidence to support a theory that the victim made-up the allegations after appellant refused to pay her for sex and to show she lied about being the victim of a sex crime. Appellant has not demonstrated deficient performance or prejudice. On appeal, this court determined that evidence of prostitution in the May 21, 2009, police report was not admissible "to support an inference that, having consented to sex as a prostitute on another occasion, [the victim] likely consented to the sexual encounter(s) between her and [appellant]." *Bautista-Eredea,* Docket No. 55178, Order at 12. Thus, trial counsel was not deficient for conceding this point. Further, as appellant did not testify that sex with the victim was for payment, counsel was not deficient in failing to present evidence to support a theory that the victim accused appellant of sexual assault as revenge for nonpayment. *Cf. Cox v. State,* 102 Nev. 253, 255-56, 721 P.2d 358, 360 (1986) (holding it was error for the district court not to allow evidence the complainant had applied for an escort license after the offense because it was not offered to prove consent and it was relevant to the defense theory that the complainant offered sex for money and made-up the allegation to extort money). Appellant further fails to demonstrate that there was a reasonable probability of a different outcome at trial had trial counsel not conceded the point. Therefore, the district court did not err in denying this claim without an evidentiary hearing.

(ECF No. 18-7 at 6-7.)

The NSC was reasonable in its determination that trial counsel's performance was not deficient under *Strickland*. Objection was futile because, as the state supreme court determined on direct appeal, evidence of M.C.'s prostitution in an unrelated circumstance was not admissible to support an inference that she consented to the sexual encounter with Bautista. The record also strongly indicates counsel's concession to the exclusion of prostitution was a reasonable strategic decision. The record shows defense counsel was aware that a defense that M.C. and Bautista engaged in sexual activity by consent due to a prostitution arrangement was a possibility, and counsel argued that if such a defense was presented, the evidence of prostitution would be relevant to show absence of mistake. The defense, however, chose to present no evidence supporting a theory that M.C. and Bautista's sexual activity was consensual based on an act of prostitution. Because the NSC's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the state court proceeding, Ground 3(D) is denied.

### 6.    Consideration of Counsel's Conduct as a Whole

Although IAC claims are examined separately to determine whether counsel was deficient, *Strickland* instructs that the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691-92. The performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances.*" *Id.* at 692 (emphasis added); *see also Boyde*, 404 F.3d at 1176 ("Prejudice may result from the cumulative impact of multiple deficiencies." (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978))). The Ninth Circuit Court of Appeals has held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Browning v.*

1 │ *Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (quoting in part *Strickland*,
2 │ 466 U.S. at 690).

3 │         On consideration of the merits of Bautista's IAC claims, including counsel's
4 │ deficient but not prejudicial performance as discussed in Ground 3(C), and assuming he
5 │ could overcome the procedural default of Ground 3(B), the Court concludes Bautista does
6 │ not show that, overall, trial counsel's actions or omissions were deficient and prejudicial.
7 │ Thus, Bautista has not demonstrated constitutionally inadequate assistance of trial
8 │ counsel that denied him due process or a fair trial.

9 │         **E.**    **Ground 4: Prosecutorial Misconduct**

10 │         Bautista alleges the State suppressed materially exculpatory and impeachment
11 │ evidence in violation of Due Process under the Fifth and Fourteenth Amendments by
12 │ failing to disclose to the defense the Call Detail for M.C.'s pretrial June 2009 MPD report[11]
13 │ and her posttrial MPD reports generated in December 2009 and 2013. (ECF No. 34 at
14 │ 46-51.) He alleges that disclosure of the reports would have allowed him to seek a new
15 │ trial under NRS § 176.515. (*Id.* at 52.)

16 │         **1.**    **Additional Background**

17 │         Bautista moved for discovery of "all statements made by M.C., which are taped or
18 │ otherwise recorded," and "any and all information known, or which could be known by the
19 │ diligent actions of the State of any previous allegations of sexual misconduct made by
20 │ [M.C.]," in the possession of the State or its agents." (ECF No. 9-12 at 2-3.) The State
21 │ responded that it would "provide all written or recorded statements" made by M.C. "which
22 │ are 'within the possession, custody, or control of the state, the existence of which is
23 │ known, or by the exercise of due diligence may become known, to the prosecuting
24 │ attorney.'" (ECF No. 9-15 at 5-6.) The State was unaware of any "previous allegations of

25 │

26 │       [11]Bautista alleges that, although trial counsel obtained the June 13, 2009, report,
27 │ it was missing the Call Detail. (ECF No. 34 at 51.) On June 13, 2009, MPD responded to
   │ a call that M.C. might be involved "in some illegal activity" inside a truck parked behind a
28 │ gas station. (ECF No. 30-2.) The Call Detail states "thought officer should check on [M.C.]
   │ know[n] to have history of prostitution in the city. [S]ubject was walking toward I-15 in
   │ some very suggested [sic] clothing and complainant thought she should be checked." (*Id.*)

sexual misconduct made by M.C. . . ." (*Id.* at 8.) At the hearing on the motion, defense counsel informed the court they had the capacity to run a background report to determine whether M.C. was previously identified as a victim in Nevada. (ECF No. 91-6 at 9.) At trial, defense counsel disclosed they were aware of "lots of other police reports" involving M.C. and the State indicated it was unaware of them:

> THE COURT: Well, what was going on in that little town? What was going on between the time she first reported this to the police in the fall and—
>
> [DEFENSE COUNSEL]: Oh, we have other—lots of other police reports involvement, too, Your Honor.
>
> This [was] the most interesting one.
>
> There is more where there were different circumstances around Mesquite, but I'm not trying to get into all of that business.
>
> THE COURT: Yeah, that's bad enough.
>
> [THE STATE]: This is the first I have heard of that, however, I just want to make the record clear that what they are showing her is not [M.C.]'s statement, it's just the police report.

(ECF No. 11-1 at 36-37.)

### 2.    Standards for the State's Obligation Under *Brady*

The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecutor. *Brady*, 373 U.S. at 87. "Evidence favorable to the accused" includes evidence that would help the defendant impeach a witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). A *Brady* violation for failure to disclose evidence contains three components: (1) evidence is favorable because it is exculpatory or impeaching, (2) the State suppressed that evidence, and (3) the evidence was material or resulted in prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citation omitted).

Evidence may be deemed "suppressed" for the purpose of *Brady* even where the prosecutor was unaware that others, acting on the government's behalf, had such evidence. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Youngblood v. W. Virginia*, 547 U.S. 867, 870 (2006) (holding suppression under *Brady* occurs even if the evidence is "known only to police investigators and not to the prosecutor") (citation and

quotation marks omitted). The prosecution is required to produce *Brady* and *Giglio* material to the defense whether the defendant requests any such evidence. *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

The Supreme Court has acknowledged that nothing in its precedents has suggested that "the principles of *Brady*, " i.e., "that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial," "continue after the defendant was convicted and the case was closed." *Osborne*, 557 U.S. at 68. The Supreme Court explained that "*Brady* is the wrong framework" in such circumstances as the "right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that [a defendant] has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Id.* at 69.

### 3.    Analysis of Ground 4

On postconviction review, the NSC denied the *Brady* claim finding that *Brady* is the wrong framework for the claim:

> [A]ppellant argues the district court erred in denying his claim that the State withheld evidence that the victim falsely claimed to be a victim of sexual assault on numerous occasions. *Brady v. Maryland* requires the State to disclose material evidence that is favorable to the defense. 373 U.S. 83, 87 (1963); *see also Mazzan v. Warden,* 116 Nev. 48, 67, 993 P.2d 25, 37 (2000) ("[T]here are three components to a *Brady* violation: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material."). The district court concluded that the State had not withheld the police reports at issue. We agree. Appellant conceded his trial counsel received the police reports regarding the incidents that occurred before the trial.

> > [FN 8] To the extent that appellant alleges he did not have a call log which included a notation of prostitution associated with a June 2009 police report, this evidence would not have been admissible as discussed above, and most importantly, would not have supported appellant's premise that withheld evidence contained a false allegation of sexual assault. As such, the evidence was not material.

> And at the time of the trial, the State could not have withheld police reports for incidents that occurred *after* the trial. Any failure to disclose this evidence after the remand on appeal would not be a *Brady* violation because there was no second trial and therefore no way to assess the evidence's materiality.

> > [FN 9] Appellant mistakenly frames the *Brady* violation as impacting his ability to litigate a motion for a new trial for the

reasons discussed below.

*See Mazzan,* 116 Nev. at 66, 993 P.2d at 36 (defining materiality as a reasonable probability (or possibility, if there was a specific request) that the result of the trial would have been different if the evidence had been disclosed). Moreover, regarding the posttrial incidents, *Brady* is the wrong framework. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne,* 557 U.S. 52, 68-69 (2009) (concluding that "*Brady* is the wrong framework" to address any disclosure obligation in the postconviction setting because the liberty interest is not the same after a conviction and the State therefore has "more flexibility in deciding what procedures are needed in the context of postconviction relief"). Therefore, the district court did not err in denying this claim.

[FN 10] We need not reach appellant's additional arguments about the materiality of the post-trial incidents.

(ECF No. 18-7 at 8-9.)

The NSC was reasonable in its determination that the State was not obligated to disclose the Call Detail for the June 13, 2009, MPD report on the ground that the Call Detail was immaterial. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682; *see also Kyles,* 514 U.S. at 434. The Call Detail does not evince that M.C. made any false statements or false allegations of sexual assault, was engaging in sexual activity on June 13, 2009, or lied about consensual activities on that date. *See id.* The information about M.C.'s prostitution contained in the Call Detail was immaterial, given that Bautista did not pursue a defense that M.C. consented to the sexual activity because she was acting as a prostitute and fabricated her rape allegation due to a misunderstanding about the agreed-upon services or Bautista's failure to compensate her. And the information in the Call Detail regarding M.C.'s suggestive clothing and her behavior walking toward the highway was not probative of whether M.C. consented to sexual activity with Bautista.

The NSC reasonably determined the State had no obligation under *Brady* to disclose the December 2009 and 2013 MPD reports that were made after the September 2009 trial. As a practical matter, there was no *Brady* obligation because there was no trial after those reports were generated. The retrial of the kidnapping charge never took place

and, the sexual assault conviction was not a candidate for retrial because it was not reversed. Although it was possible in December of 2009 for trial counsel to pursue a motion for new trial based on newly discovered evidence, *see supra* at 61-63, the NSC reasonably determined that, commensurate with Supreme Court authority, there was no retrial and therefore no *Brady* obligation to disclose the December 2009 report. Due process requires a prosecutor to disclose material exculpatory evidence to the defendant "before trial." *See Osborne*, 557 U.S. at 68. The Court will, however, issue a Certificate of Appealability for Ground 4 insofar as the State's obligation under *Brady* to disclose the December 2009 MPD report as reasonable jurists could conclude the Court's assessment of the constitutional claim is debatable or wrong. *Slack*, 529 U.S. at 483-84.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Bautista. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 483-84 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether this Court's procedural ruling was correct. *See id*. Applying this standard, a certificate of appealability is warranted for Grounds 1, 2(B), 2(E), 3(C), and 4 of the Petition, as set forth in the discussion of those claims, because reasonable jurists could find the Court's assessment of the constitutional claims debatable or wrong. A certificate of appealability is not warranted for any other Grounds in the petition.

///

71

**VI.     CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

It is therefore ordered that the Third Amended Petition (ECF No. 34) is conditionally granted as to Ground 2(A) and denied as to the remaining grounds. The state court's judgment of conviction of Petitioner Eberto Bautista-Eredea in Case No. C-252761 in the Eighth Judicial District of Nevada is hereby vacated. Within 30 days of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, unless the State files a written election in this matter within the 30-day period to retry Bautista-Eredea and thereafter commences jury selection in the retrial within 120 days following election to retry Bautista-Eredea, subject to reasonable request for modification of the time periods in the judgment by either party under Rules 59 and 60.

It is further ordered that all motions and requests for an evidentiary hearing are denied.

It is further ordered that a Certificate of Appealability is granted for Grounds 1, 2(B), 2(E), 3(C), and 4 of the Petition, as set forth in the discussion of those claims, and a Certificate of Appealability is denied for all other Grounds of the Petition.

The Clerk of Court is further directed to (1) substitute Nethanjah Breitenbach for Respondent Warden Garrett; (2) enter judgment accordingly; (3) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court of Nevada in connection with that court's case number C-252761; and (4) close this case.

DATED THIS 8th Day of January 2025.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE